******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court denying his motion to revoke the commitment of his minor daughter to the custody and care of the petitioner, the Commissioner of Children and Families. The father claimed, inter alia, that the trial court improperly failed to hold a hearing to determine his fitness as a parent before infringing on his right to the custody and care of his child. The commissioner, who had been granted an ex parte order of temporary custody shortly after the child was born, had filed a petition alleging that the child was uncared for. The trial court found that the child had been uncared for and committed her to the custody of the commissioner. The man whom the child's mother had identified as the father in that proceeding later was determined not to be the father and was dismissed from the case. The respondent father thereafter was cited into the case and, after genetic testing, was determined to be the child's biological father. The trial court denied the father's first motion to revoke commitment, from which he did not appeal. After the court issued certain specific steps to the father to aid with his reunification with the child, the father filed a second motion to revoke commitment, which the court also denied, concluding that his failure to comply with the specific steps impacted his ability to meet the child's needs and to keep her safe. The court conducted hearings on both motions in which the father was accorded the opportunity to present evidence regarding his fitness to take custody of the child. *Held*:

1. The respondent father could not prevail on his unpreserved claim that the trial court violated his right to procedural due process when it denied his motion to revoke the commitment of the child to the commissioner without first conducting a hearing to determine his fitness as a parent; the procedures set forth in the statute (§ 46b-129 [m]) and rule of practice (§ 35a-14A) pertaining to the revocation of the commitment of a minor child, pursuant to which the moving party bears the burden of proving that a cause for commitment no longer exists, and if the movant is successful, the court must determine whether revocation of commitment is in the best interest of the child, strike the appropriate balance between the commissioner's and the father's interests, and comply with procedural due process requirements, and the procedural requirement advocated by the father, namely, that an adjudicative hearing be held in which the father would be presumed to be a fit parent and would automatically obtain custody of the child unless the commissioner could establish otherwise was inappropriate, unwarranted and ill-advised under the circumstances here, as the child previously had been adjudicated uncared for and committed to the custody of the commissioner, who has a substantial interest in ensuring the well-being of children placed in her custody, and the father's desire to take custody of and care for the child did not justify the creation of a process that would require the court to turn over a child to a person who did not know anything about the child or her needs.

2. The respondent father's unpreserved claim that, as applied, the statute (§ 46b-129 [m]) governing the revocation of a minor child's commitment infringed on his right to substantive due process was unavailing; the trial court, in applying the burden to the father to prove that a cause for commitment no longer existed, in response to his motion to revoke commitment, properly applied the law and did not violate the father's right to substantive due process, as he was not entitled to a presumption of fitness after the child had been adjudicated uncared for and committed to the custody of the commissioner, there was a compelling reason to protect the child from harm given that she was uncared for when she was merely days old, the court was not required to presume that the father was a fit parent who was acting in the child's best interest where, as here, his motion to revoke commitment had been filed nearly two

years after the adjudication and commitment of the child to the commissioner, and although, at the time of that adjudication, another man was alleged to have been the child's father and the respondent father was not a party to that case, that did not change the fact that the child had been adjudicated to be uncared for and was in need of the commissioner's protection and intervention.

Argued May 21—officially released July 11, 2018**

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the minor child of the respondent mother and the putative father uncared for, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, and tried to the court, *Mosley, J.*; judgment adjudicating the minor child uncared for and committing the minor child to the custody of the petitioner; thereafter, the court, *Conway, J.*, dismissed the action as to the putative father; subsequently, the court, *Marcus, J.*, granted the motion filed by Jonathan S. to be cited in as the respondent biological father of the minor child; thereafter, the court, *Marcus, J.*, denied the respondent father's motions to revoke commitment, and the respondent father appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent father).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

BRIGHT, J. The respondent father, Jonathan S., appeals from the judgment of the trial court denying his motion to revoke the commitment of his minor daughter, Zoey H., to the petitioner, the Commissioner of Children and Families.[1] The respondent claims that (1) his right to procedural due process under the United States constitution was violated by the court's failure to hold a hearing to determine his fitness as a parent before depriving him of the custody and care of his child, and (2) as applied, General Statutes § 46b-129 (m) violates his right to substantive due process under the United States constitution and improperly assigns the burden of proof to him. We affirm the judgment of the trial court.

The following factual findings, which are not challenged, and procedural history are relevant to our consideration of the issues raised on appeal. Zoey was born on May 9, 2015. Because her mother, M, was homeless and exhibited behavior that raised concerns about her ability to care for Zoey,[2] the petitioner sought and was granted an ex parte order of temporary custody, thereby removing Zoey from M's custody. Zoey was placed in a nonrelative foster home, where she remained up to and through the hearing that resulted in the judgment at issue in this appeal. On September 23, 2015, following a hearing, and with M's admission, the court adjudicated Zoey to be uncared for and committed Zoey to the custody of the petitioner. The man that M identified as Zoey's father, who appeared at the hearing, stood silent with respect to the adjudication. Thereafter, genetic testing established that he was not Zoey's biological father, and on October 13, 2015, he was dismissed from the case. After Zoey's commitment, M engaged in some sporadic mental health services, but soon stopped taking advantage of such services and began to deny the need for further treatment. In March, 2016, the respondent came forward and moved to be cited into the case, asserting that he was Zoey's actual father; the court added him as a party. Genetic testing confirmed that the respondent was Zoey's biological father, and, on May 19, 2016, the court adjudicated him as such.

On May 6, 2016, before the results of genetic testing were submitted to the court, the respondent filed a motion to revoke Zoey's commitment to the petitioner. The motion was supported by M, who did not seek revocation and custody herself. The petitioner filed an objection to the respondent's motion to revoke commitment. The court scheduled a review of the matter for June 20, 2016, at which time the respondent was presented with specific steps that had been drafted by the Department of Children and Families (department) to aid with his reunification with Zoey. The respondent refused to sign the specific steps after objecting to some of them, including undergoing a substance abuse evalu-

ation and a mental health evaluation. Nevertheless, the respondent did agree to visits with Zoey, supervised by All Pointe, LLC, and he agreed to attend psychotherapy at the Yale Child Study Center. The court, over the respondent's objection, accepted all of the specific steps recommended by the department and, on June 20, 2016, made them orders of the court.

On July 14, 2016, the court held a hearing on the respondent's motion to revoke commitment.[3] After considering the evidence presented and the arguments advanced, the court denied the respondent's motion. The court commended the respondent for coming forward and for being proactive. It held, however, that the respondent had failed to put forth a prima facie case that would permit the court to revoke Zoey's commitment. The court explained that it would not be in Zoey's best interest for her commitment to be revoked, but that with psychotherapy to assist the respondent with recognizing Zoey's particular needs, and some assistance with creating a better bond with Zoey, the respondent, after continued supervised visitation and psychotherapy sessions, might be successful in reunification. The respondent did not appeal from that July 14, 2016 judgment.

Instead, the respondent continued to engage in supervised visitation with Zoey and actually began some of the services set forth in the specific steps ordered by the court. In particular, in September, 2016, the respondent attended his first appointment at the parent-child psychotherapy program at the Yale Child Study Center. The respondent was discharged from the program one month later when he failed to attend his next scheduled appointment and did not return calls or text messages from the center. Similarly, the respondent attended the first of ten parenting classes through All Pointe, LLC, but never completed another class.

On June 8, 2017, nearly one year after the denial of his first motion to revoke commitment, the respondent filed a second motion to revoke commitment. The court held a hearing on the motion on August 30, October 10 and October 26, 2017, at which the respondent argued that he had done everything necessary to secure reunification with Zoey. The petitioner argued that the respondent had failed to comply with the specific steps that the court had ordered, that he did not have a good understanding of Zoey's needs, that he did not have a sufficient bond with her because he failed to attend the parent-child therapy as ordered, and that he had engaged in concerning behavior during some of his visits with Zoey.

In a very thorough October 31, 2017 memorandum of decision, the court found that the respondent failed to comply with *any* of the court-ordered specific steps, with the exception of supervised visitation. The court also credited the respondent's testimony that he would

not abide by any court orders until he obtained custody of Zoey, and that he would "not participate in recommended services that were ordered by [the] court in order to meet Zoey's needs prior to reunification." The court discussed the respondent's unwillingness to heed the recommendations of medical professionals, and it concluded that the respondent "show[ed] a lack of regard for Zoey's needs . . . putting his need to be sole decision maker regarding Zoey's diet . . . before Zoey's health." The court further found that the respondent was unwilling to communicate with Zoey's foster parents because, in the words of the respondent, "they come from two different worlds and have nothing in common. They have a nanny and he does not. He further stated that there is nothing they can tell him about his own child."

The court also discussed the respondent's inability to recognize safety issues concerning Zoey. It commented on the respondent's testimony that, despite M's unaddressed mental health issues, he would permit her to visit with Zoey whenever she wanted to visit. The court also commented on the respondent's aggression and outbursts at the Boys and Girls Village, which caused Zoey to exhibit fear during several visits that were conducted there. The court credited the testimony of a department social worker, Renata Tecza, that the reason the department was insisting that the respondent undergo a mental health evaluation was because his "anger 'rises to a different level,' and this is a concern for Zoey's safety going forward."

On the basis of this and other evidence, the court denied the respondent's motion to revoke commitment, finding that "the preponderance of the evidence shows that the [respondent's] failure to comply with his specific steps impacted his ability to meet Zoey's needs both medically and emotionally. This failure also has had an impact upon his ability to keep her safe." This appeal followed. Additional facts will be set forth as necessary.

I

The respondent claims that his right to procedural due process under the United States constitution was violated by the court's failure to hold an adjudicative hearing to determine his fitness as a parent before infringing on his right to the custody and care of his biological child. Insofar as this claim may not have been preserved properly, he requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The petitioner argues that the respondent's claim is not only unpreserved, but that it is unreviewable because the respondent is attempting to attack the original judgment that adjudicated Zoey uncared for and committed her to the petitioner's custody. She contends that the respondent did not request an adjudicative hearing and that he should have filed a motion to open

the original judgment on the basis of mutual mistake regarding paternity as soon as he was added as a party to this case and determined to be Zoey's biological father. She argues: "He cannot now, after having twice lost at trial on motions to revoke commitment, argue that the original judgment was defective because he didn't have the opportunity to participate in the dispositional hearing that led to Zoey . . . being committed." We conclude that the respondent's claim is reviewable under *Golding*, but that the claim fails to satisfy *Golding*'s third prong because the court did not violate the respondent's right to procedural due process when it denied his motion to revoke commitment.

Under *Golding*, "a [respondent] can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [respondent's] claim will fail." (Emphasis omitted; footnote omitted.) Id.; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding* by eliminating word "clearly").

The respondent's claim meets the first two prongs of *Golding* and, therefore, is reviewable. As to the first prong, as is conceded in the petitioner's appellate brief, the record is clear that the respondent did not receive the type of hearing to which he now claims he was constitutionally entitled, a hearing in which the petitioner would have the burden of proving that the respondent was not fit to have custody of Zoey. As to the second prong, the respondent is claiming a violation of his procedural due process rights in the custody and care of his biological child. We conclude, therefore, that the claim is reviewable. We conclude, however, that the respondent's claim fails to satisfy the third prong of *Golding* because the alleged constitutional violation does not exist.

Whether the lack of an adjudicative hearing at which the petitioner bore the burden of proving that the respondent was unfit to have custody of Zoey deprived the respondent of procedural due process is a question of law as to which our review is plenary. See *In re Lukas K.*, 300 Conn. 463, 469, 14 A.3d 990 (2011); *In re Shaquanna M.*, 61 Conn. App. 592, 600, 767 A.2d 155 (2001). "The United States Supreme Court in *Mathews* v. *Eldridge*, [424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)], established a three part test to determine whether the actions of the court violated a party's right

to procedural due process. The three factors to be considered are (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens attendant to increased or substitute procedural requirements. . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." (Internal quotation marks omitted.) *In re Lukas K.*, supra, 469.

The respondent primarily relies on a pre-*Mathews* case, however, *Stanley* v. *Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), to support his argument that "each biological parent is entitled to a fitness hearing as a matter of procedural due process before the state may infringe his or her fundamental right to the custody of his or her child. In other words, where only one parent is adjudicated to have neglected a child, the state may not deprive the nonoffending parent of custody without a hearing to adjudicate whether he or she has neglected, abandoned, or abused a child . . . . Because the [respondent] has not been provided with such an adjudicatory hearing in this case, this court should reverse the trial court's order denying the [respondent's] motion for revocation and hold that he is entitled to immediate custody of Zoey." We address *Stanley* first, and we conclude that it is inapposite.

In *Stanley* v. *Illinois*, supra, 405 U.S. 651, the plaintiff, an unwed father who had "sired and raised" his children, wanted to continue to raise them after their mother had died, but the children, after a dependency proceeding in accordance with Illinois law that presumed unwed fathers to be unfit parents, became wards of the state. Id., 646. The United States Supreme Court considered whether the Illinois statutory scheme, which presumed unwed fathers, but not unwed mothers, to be unfit to raise their children, violated the equal protection clause of the fourteenth amendment to the United States constitution. Id., 647. Under Illinois law, the actual fitness of the unwed father was irrelevant. Id. The court held: "[A]s a matter of due process of law, [the plaintiff] was entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their children is challenged, the State denied [the plaintiff] the equal protection of the laws guaranteed by the Fourteenth Amendment." Id., 649.

In the present case, the respondent was not known to be Zoey's biological father at the time the petitioner filed her preliminary neglect petition, on May 15, 2015, seeking temporary custody of Zoey, who was merely

days old, on the ground that she had been permitted to live under conditions that were injurious to her well-being. In fact, M had declared another man to be Zoey's father, and he was named in the case, although he had not acknowledged paternity. At a later hearing on September 23, 2015, the state amended the ground of the petition to allege only that Zoey was uncared for because M was homeless. M admitted that allegation, while the putative father, who was incarcerated at the time but did appear for the hearing, stated that he would stand silent. The court then adjudicated Zoey uncared for and ordered her committed to the care and custody of the petitioner *by agreement of the parties*.

In contrast, in *Stanley*, the children had not been adjudicated uncared for, abused, or neglected; they simply were made wards of the state because their father had not been married to their mother at the time of their mother's death, despite the fact that he had "sired and raised" the children; id., 651; and, despite the fact that an unwed mother would not automatically have been declared unfit if the father of the children had died. Id., 646–47. The Supreme Court readily acknowledged the importance of a state's right and its duty to protect uncared for or neglected children, but that was not the issue of concern for the court in *Stanley*: "The State's right—indeed, duty—to protect minor children through a judicial determination of their interests in a neglect proceeding is not challenged here. Rather, we are faced with a dependency statute that empowers state officials to circumvent neglect proceedings on the theory that an unwed father is not a 'parent' whose existing relationship with his children must be considered." Id., 649–50.

Although the respondent contends that, before the state can remove children from their biological parents, it first must afford those parents an adjudicatory fitness hearing, in the present case, Zoey was adjudicated uncared for by the Superior Court and committed to the care and custody of the petitioner *before the respondent ever appeared* and asserted that he was Zoey's father; indeed, a different man was purported to be her father, and he appeared at the hearing on the petition. The respondent's later appearance in the case and the results of his paternity test do not change the *historical fact* that, *at the time of her commitment, Zoey was homeless and, therefore, uncared for* within the meaning of our child protection statutes,[4] regardless of parentage.[5] When the respondent filed his motion to revoke commitment, the petitioner was the party who had custody of Zoey, and the respondent was seeking to revoke the petitioner's custody.

Furthermore, unlike the father in *Stanley*, the respondent had hearings on both of his motions to revoke commitment at which he was accorded the opportunity to present evidence regarding his fitness to take custody

of Zoey. In *Stanley*, the United States Supreme Court held that the plaintiff had to be "[g]iven the opportunity to make his case" for custody. Id., 655. It further held that "the state's interest in caring for [the plaintiff's] children is de minimis if [the plaintiff] is shown to be a fit father." (Emphasis omitted.) Id., 657–58. Thus, *Stanley* merely requires, as a matter of procedural due process, a hearing at which the parent can present his or her case on fitness. It does not require, as the respondent claims, that the petitioner bear the burden of proving the father unfit at that hearing.[6] Accordingly, *Stanley* is not applicable to this case.

We now examine the three factors set forth in *Mathews* v. *Eldridge*, supra, 424 U.S. 335, which will assist us in determining whether the level of process afforded the respondent was constitutionally sufficient. The respondent claims that these factors demonstrate that the court infringed on his federal constitutional right to procedural due process by not holding an adjudicatory hearing wherein his fitness as a parent was presumed. We disagree.

As to the first factor, namely, "the private interest that will be affected by the official action"; id.; we agree with the respondent that his private interest in directing the care and custody of his biological child is substantial. See *In re Baby Girl B.*, 224 Conn. 263, 279, 618 A.2d 1 (1992) ("the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection").

As to the second factor, namely, "the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards"; (internal quotation marks omitted) *In re Lukas K.*, supra, 300 Conn. 469; see *Mathews* v. *Eldridge*, supra, 424 U.S. 335; we are not persuaded under the facts of this case that the court's adherence to our statutory procedures created a substantial risk of an *erroneous* deprivation of the respondent's private interest or that an adjudicatory hearing meant solely to assess the respondent's fitness as a parent for Zoey, at which his fitness would be presumed, would have been an appropriate response to the respondent's motion to revoke commitment.

The respondent argues that "the process afforded to [him] as part of his motion to revoke commitment is insufficient to satisfy the requirement of due process." As examples, the respondent points to the court's having placed the burden of proof on him to establish the absence of a cause for commitment, and the court's failure to assess whether the respondent, himself, neglected, abused, or abandoned Zoey. Under the facts and circumstances of this case, we conclude that the process afforded the respondent in response to his motion to revoke commitment was constitutionally suf-

ficient in light of Zoey's already having been adjudicated uncared for and placed in the petitioner's custody for her protection.

As previously stated in this opinion, at the time the petitioner filed a neglect petition, Zoey was days old. M identified another man as Zoey's father. At a hearing on September 23, 2015, the petitioner, with the agreement of M, amended the ground of the neglect petition to allege only that Zoey was uncared for. M admitted that allegation while the putative father stated that he would stand silent. The court then adjudicated Zoey uncared for and ordered her committed to the care and custody of the petitioner by agreement of the parties, thus properly proceeding with the two phases, adjudication and disposition, required by § 46b-129 (j) (2).[7] See *In re Joseph W.*, 305 Conn. 633, 643, 46 A.3d 59 (2012). In the September 23, 2015 hearing, the petitioner bore the burden of proving that Zoey was uncared for, which she clearly met. The next phase of the hearing was the dispositional phase at which the court determined which of the § 46b-129 (j) (2) dispositional options was in the best interest of Zoey *at that time*. Clearly, in this case, at the time of the September 23, 2015 hearing, placement with the petitioner was in Zoey's best interest; her mother was homeless, her purported father did not acknowledge paternity and was incarcerated, and neither of them proposed another option. On these facts, the court properly adjudicated Zoey uncared for and ordered her committed to the care and custody of the petitioner.

Approximately six months later, in March, 2016, the respondent appeared, asserting that he was Zoey's biological father. On May 6, 2016, the respondent filed a motion to revoke commitment on the ground that he was "ready, willing, and able to care for his child," that recent paternity tests revealed him to be Zoey's biological father, and that it was not in Zoey's best interest to be committed to the care and custody of the petitioner. The court received the results of the genetic testing on May 19, 2016, and adjudicated the respondent to be Zoey's father. This adjudication of parentage took place when Zoey was more than one year old, and eight months after she had been adjudicated uncared for and committed to the care and custody of the petitioner, in whose custody she had been since she was days old. Eventually, the court denied the respondent's motion to revoke commitment, and the respondent did not appeal from that judgment.

On June 8, 2017, when Zoey was more than two years old, and approximately twenty-one months after the court adjudicated her uncared for and ordered her committed to the care and custody of the petitioner, the respondent filed a second motion to revoke commitment, on the same grounds set forth in his first motion. The court denied that motion on October 31, 2017. The

denial of this motion is the subject of the present appeal.

A motion to revoke commitment is governed by § 46b-129 (m) and Practice Book § 35a-14A. Section 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months."

Practice Book § 35a-14A provides: "Where a child or youth is committed to the custody of the commissioner . . . the commissioner, a parent or the child's attorney may file a motion seeking revocation of commitment. The judicial authority may revoke commitment if a cause for commitment no longer exists and it is in the best interests of the child or youth. Whether to revoke the commitment is a dispositional question, *based on the prior adjudication*, and the judicial authority shall determine whether to revoke the commitment upon a fair preponderance of the evidence. The party seeking revocation of commitment has the burden of proof that no cause for commitment exists. If the burden is met, the party opposing the revocation has the burden of proof that revocation would not be in the best interests of the child. If a motion for revocation is denied, a new motion shall not be filed by the movant until at least six months have elapsed from the date of the filing of the prior motion unless waived by the judicial authority." (Emphasis added.)

Pursuant to § 46b-129 (m) and Practice Book § 35a-14A, the moving party bears the burden of proving that a cause for commitment no longer exists; if he or she is successful, the court then must determine whether revocation of commitment is in the best interest of the child. In the present case, the respondent contends that it was a violation of his procedural due process right for the court to place the burden on him to establish that no cause for commitment existed. He argues that the court, instead, should have held an adjudicative hearing wherein it presumed he was a fit parent, and, unless the petitioner could establish otherwise, he, essentially, automatically would get custody of this child, despite the fact that she already had been adjudicated uncared for and her custody had been transferred to the petitioner. We disagree with the respondent.

Zoey was born in May, 2015, and adjudicated uncared for in September, 2015, and committed to the care and custody of the petitioner. The motion to revoke commitment from which the respondent now appeals was filed on June 8, 2017, when Zoey was more than two years old and nearly two years after Zoey's adjudication and commitment. The record indicates that Zoey did not know the respondent for the first year of her life. Similarly, at the time he filed his first motion to revoke

commitment, the respondent knew little or nothing about Zoey, other than that he might be her biological father. He had no idea about her medical, social or psychological needs. He was, for all practical purposes, a stranger to Zoey. The respondent did not challenge on appeal the court's denial of his first motion to revoke commitment. Instead, he initially made efforts to comply with some of the specific steps ordered by the court in connection with the first motion, and he participated in supervised visitation with Zoey. Thus, by the time of the hearing on the respondent's second motion to revoke commitment, the court had available to it substantial evidence of the respondent's interactions with Zoey and his efforts to prepare himself to take custody of a child who had spent virtually her entire life in the petitioner's custody. The evidence was presented to the court in a three day hearing that involved numerous witnesses. The court rendered a detailed opinion on the basis of that evidence and concluded that a cause for commitment still existed.[8] A necessary predicate to this conclusion is the court's determination that the respondent was not fit, at that time, to care for Zoey. On the basis of the record before us, we are confident that the procedure afforded the respondent satisfied the second prong of *Mathews*. The procedures in place did not pose an inappropriate risk of an *erroneous deprivation* of the respondent's interest in the care and custody of his child, and the alternative procedural "safeguard" now advocated by the respondent was not appropriate under the facts and procedural posture of this case.

As for the third *Mathews* factor, "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"; *Mathews* v. *Eldridge*, supra, 424 U.S. 335; we conclude that the additional or substitute procedural requirement for which the respondent advocates—namely, an adjudicative hearing wherein he is presumed to be a fit parent, and, unless the petitioner could establish otherwise, he, essentially, automatically would get custody of this child, despite the fact that the child *already had been adjudicated uncared for* and custody had been given to the petitioner for her protection—simply is inappropriate, unwarranted, and ill-advised under the facts and circumstances of this case, regardless of any fiscal and administrative burdens that such a procedure would entail. The petitioner has a substantial interest in ensuring the well-being of children that have been placed in her custody. Although the respondent's desire to take custody of and care for Zoey is admirable, it does not justify the creation of a process that would require the court to turn over a child who, properly and without contest, has been adjudicated uncared for to a person who does not know anything about the child or her needs.

Balancing the three *Mathews* factors, we conclude that the respondent has not established that his right to procedural due process was violated by the lack of an adjudicatory hearing, in response to his motion to revoke commitment, wherein he would be presumed to be a fit parent for Zoey, a child adjudicated uncared for by the Superior Court almost two years earlier. We conclude that the procedures set forth in § 46b-129 (m) and Practice Book § 35a-14A strike the appropriate balance between the petitioner's and the respondent's interests, and comply with the constitution's procedural due process requirements. Accordingly, there is no procedural due process violation under the facts of this case, and, therefore, the respondent's claim fails under *Golding*'s third prong.

## II

The respondent next claims, "as applied to the respondent father in this case . . . § 46b-129 (m) violates his substantive due process right to custody and care of his child." He argues that he "has a substantive due process right to the custody and care for his child that may not be infringed unless he has been adjudicated to be an unfit parent, or a trial court has found that granting his motion to revoke commitment would present a risk of imminent harm to the child." He also argues that the court improperly placed the burden of proof on him and thereby failed to provide adequate protection for his fundamental right. We are not persuaded.

Insofar as the claim is unpreserved, the respondent requests *Golding* review. *State* v. *Golding*, supra, 213 Conn. 239–40. As with the respondent's procedural due process claim, he meets the first two prongs of *Golding* and, therefore, this claim is subject to review. As to the third prong of *Golding*, however, we conclude that the alleged constitutional violation does not exist.

"For all its consequence, due process has never been, and perhaps never can be, precisely defined. *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 24, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). However, [s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary [government] action. *County of Sacramento* v. *Lewis*, 523 U.S. 833, 845, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998); see also *Tenenbaum* [v. *Williams*, 193 F.3d 581, 600 (2d Cir. 1999)] ([s]ubstantive due-process rights guard against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective) [cert. denied sub nom. *Tenenbaum* v. *City of New York*, 529 U.S. 1098, 120 S. Ct. 1832, 146 L. Ed. 2d 776 (2000)] . . . ." (Internal quotation marks omitted.) *Kia P.* v. *McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000), cert. denied sub nom. *Kia P.* v. *City of New York*, 534 U.S. 820, 122

S. Ct. 51, 151 L. Ed. 2d 21 (2001).

"Parents have a substantive right under the [d]ue [p]rocess [c]lause to remain together [with their children] without the coercive interference of the awesome power of the state. . . . Such a claim can only be sustained if the removal of the child would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled. . . . In other words, while a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the fact of [the] removal itself." (Citations omitted; internal quotation marks omitted.) *Southerland* v. *City of New York*, 680 F.3d 127, 142 (2d Cir. 2012), cert. denied, 568 U.S. 1150, 133 S. Ct. 980, 184 L. Ed. 2d 773 (2013).

"The substantive due-process guarantee also provides heightened protection against government interference with certain fundamental rights and liberty interests. . . . We have described the interest of a parent in the custody of his or her children as a fundamental, constitutionally protected liberty interest. . . . No matter how important the right to family integrity, [however] it does not automatically override the sometimes competing compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." (Citations omitted; internal quotation marks omitted.) *Kia P.* v. *McIntyre*, supra, 235 F.3d 758.

"In discussing the constitutional basis for the protection of parental rights, the United States Supreme Court observed in *Troxel* [v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)] that '[t]he liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this [c]ourt. More than [seventy-five] years ago, in *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401 [43 S. Ct. 625, 67 L. Ed. 1042] (1923), we held that the liberty protected by the [d]ue [p]rocess [c]lause includes the right of parents to establish a home and bring up children and to control the education of their own. Two years later, in *Pierce* v. *Society of Sisters*, 268 U.S. 510, [534–35, 45 S. Ct. 571, 69 L. Ed. 1070] (1925), we again held that the liberty of parents and guardians includes the right to direct the upbringing and education of children under their control. . . . We returned to the subject in *Prince* v. *Massachusetts*, 321 U.S. 158 [64 S. Ct. 438, 88 L. Ed. 645] (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Id.,

[166].' . . . *Troxel* v. *Granville*, supra, 530 U.S. 65–66. 'In light of this extensive precedent, it cannot now be doubted that the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' Id., 66.

"Connecticut courts likewise have recognized the constitutionally protected right of parents to raise and care for their children. See, e.g., *Denardo* v. *Bergamo*, 272 Conn. 500, 511, 863 A.2d 686 (2005); *Crockett* v. *Pastore*, 259 Conn. 240, 246, 789 A.2d 453 (2002); *Roth* v. *Weston*, [259 Conn. 202, 216, 789 A.2d 431 (2002)]; *In re Baby Girl B.*, [supra, 224 Conn. 279–80] . . . . When legislation affects a fundamental constitutional right, it must be strictly scrutinized." *Fish* v. *Fish*, 285 Conn. 24, 40–41, 939 A.2d 1040 (2008).

Section 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months."

"Our Supreme Court has held that a natural parent, whose child has been committed to the custody of a third party, is entitled to a hearing to demonstrate that no cause for commitment still exists. . . . The initial burden is placed on the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. . . . If the party challenging the commitment meets that initial burden, the commitment to the third party may then be modified if such change is in the best interest of the child. . . . The burden falls on the persons vested with guardianship to prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Citations omitted; internal quotation marks omitted.) *In re Stacy G.*, 94 Conn. App. 348, 352 n.4, 892 A.2d 1034 (2006); see *In re Nasia B.*, 98 Conn. App. 319, 328–29, 908 A.2d 1090 (2006) (Under § 46b-129 [m], "[t]he burden is upon the person applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established . . . the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is the natural parent who has moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his . . . natural parent." [Emphasis omitted; internal quotation marks omitted.]).

It is the initial burden placed on the respondent to prove a cause for commitment no longer exists that is at the heart of his substantive due process claim. In

his appellate brief, the respondent points to specific language from *Troxel* v. *Granville*, supra, 530 U.S. 68–69, which provides: "[T]he [petitioner] did not allege, and no court has found, that [the respondent] was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children. . . . Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (Citation omitted; emphasis omitted; internal quotation marks omitted.) He also argues that our Supreme Court in *Roth* specifically held that the state may infringe on a parent's fundamental right to the care and custody of his children "only when it can be demonstrated that there is a compelling need to protect the child from harm." *Roth* v. *Weston*, supra, 259 Conn. 229.

We wholeheartedly agree with these statements of the law as quoted by the respondent. Nevertheless, the respondent's attempt to apply this rationale to the present case is flawed. Neither *Troxel* nor *Roth* involved children who previously had been adjudicated neglected or uncared for. Both cases involved the constitutionality, as applied to the facts of the specific cases, of state statutes that permitted courts to interfere with a custodial parent's decision regarding a third party's right to compel visitation with their child or children. See *Troxel* v. *Granville*, supra, 530 U.S. 67 ("[t]hus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests" [emphasis in original]); *Roth* v. *Weston*, supra, 259 Conn. 205–206 (concluding that General Statutes § 46b-59 was "unconstitutional as applied to the extent that the trial court, pursuant to the statute, permitted third party visitation contrary to the desires of a fit parent and in the absence of any allegation and proof by clear and convincing evidence that the children would suffer actual, significant harm if deprived of the visitation").

In this case, there already has been a determination that Zoey was uncared for, i.e., in need of protection, and, on the basis of that adjudication, she was committed to the care and custody of the petitioner. Although we recognize that at the time of this adjudication, another man was alleged to have been Zoey's father, and the respondent was not a party to the case, it does not change the historical fact that Zoey had been adjudicated an uncared for child, who was in need of the petitioner's protection and intervention.

In applying the burden to the respondent to prove that a cause for commitment no longer existed, in response to his motion to revoke commitment, the court properly applied the law and did not violate the respondent's right to substantive due process. The respondent was not entitled to a presumption of fitness *after* his daughter already had been adjudicated uncared for and committed to the care and custody of the petitioner. Furthermore, there *was* a compelling reason to protect Zoey from harm; she was uncared for when she was merely days old, and this resulted in such an adjudication. As we previously explained in part I of this opinion, Zoey was adjudicated uncared for in September, 2015, and committed to the care and custody of the petitioner, who had been granted custody of her when she was days old. The motion from which the respondent now appeals was filed on June 8, 2017, nearly two years after Zoey's adjudication and commitment. In such an instance, the constitution does not require that the court presume that the respondent is a fit parent, acting in the best interest of his child, when the court is considering the merits of his motion to revoke his daughter's commitment, which commitment was made after the Superior Court adjudicated the child uncared for. In *Troxel* and *Roth*, the courts found that the parents' substantive due process rights were violated because the statutes at issue in those cases permitted interference with the parents' right to make decisions for their children, without the states being required to demonstrate a compelling need that warranted such interference. That is not the case here.

The state, virtually since Zoey's birth, has had the custody and responsibility to care for her. Thus, the respondent is seeking to *acquire* custody of Zoey from the petitioner following Zoey's commitment; he is not seeking to prevent interference with an existing and ongoing parent/child relationship. He has never had custody of Zoey; the petitioner has had custody since Zoey was days old. Indeed, at the time of her commitment to the petitioner, the respondent was not known to be her father. When Zoey was found to be uncared for, the respondent was not in her life providing for her care. These factual distinctions are important. Furthermore, the state's interest in protecting the well-being of Zoey, an uncared for child for whom it has been responsible for since the child's birth, is much greater than was the state's interest in *Troxel* and in *Roth*. Based on the facts of this case, we conclude that the court's application of § 46b-129 (m) did not infringe on the respondent's right to substantive due process. Accordingly, the respondent's claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142

(b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 11, 2018, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The attorney for the minor child has submitted a statement, pursuant to Practice Book § 67-13, adopting the petitioner's brief.

[2] M has been diagnosed as having personality disorders. She is not a party to this appeal; accordingly, we refer to the respondent father as the respondent.

[3] We have been furnished with an electronic copy of the entire July 14, 2016 hearing transcript. The petitioner, in her appendix, also has provided a paper copy of the portion of the July 14, 2016 transcript that contains the court's oral decision.

[4] General Statutes § 46b-120 (8) provides in relevant part that a child is "uncared for" if that child "is homeless [or his or her] home cannot provide the specialized care that the physical, emotional or mental condition of the child or youth requires  . . . ."

[5] Insofar as the respondent also argues the unconstitutionality of the "one-parent rule"; see *In re Sanders*, 495 Mich. 394, 400–401, 852 N.W.2d 524 (2014) ("The one-parent doctrine permits a court to interfere with a parent's right to direct the care, custody, and control of the children solely because the other parent is unfit, without any determination that he or she is also unfit. In other words, the one-parent doctrine essentially imposes joint and several liability on both parents, potentially divesting either of custody, on the basis of the unfitness of one."); the statutory scheme in Connecticut does not require a finding that a parent is unfit. See *In re David L.*, 54 Conn. App. 185, 191, 733 A.2d 897 (1999); General Statutes §§ 46b-120 and 46b-129 (j). Rather, our statutes focus on the status of the child, at the adjudicatory phase, regardless of who or what may have caused that status. See *In re David L.*, supra, 191; General Statutes §§ 46b-120 and 46b-129 (j). The respondent's contention that a new adjudicatory hearing was required to determine "whether he has ever abused, neglected, or abandoned the child" fails to recognize that our statutory scheme does not require a finding of parental fault. Zoey was adjudicated uncared for in September, 2015, before the respondent had stepped forward claiming to be her father. That is a *historical fact*; *she was uncared for.*

Furthermore, the facts in *In re Sanders* are materially different from those in the present case. In *In re Sanders*, the respondent father was known at the time the mother was adjudicated unfit, and, for a period of time, he had custody of the children. Nevertheless, the petitioner, the Michigan Department of Human Services, avoided a hearing on the father's fitness simply by dismissing the abuse and neglect claims against the father. *In re Sanders*, supra, 495 Mich. 403. Under Michigan's statutory scheme, this apparently allowed the petitioner to move to the dispositional phase and switch the burden of proof to the father. As set forth previously, though, that is not the procedural posture of this case. Zoey was adjudicated uncared for before the respondent even was known to be her father; he did not have custody of her, and there is no indication he was involved in her life at all. In addition, relying on *Stanley*, the Michigan Supreme Court in *In re Sanders* held that the father's "right to direct the care, custody, and control of his children is a fundamental right that cannot be infringed without *some* type of fitness hearing." (Emphasis in original.) Id., 414–15. The court then conducted an analysis under *Mathews* v. *Eldridge*, supra, 424 U.S. 319, to determine whether a hearing at the dispositional phase, after one parent has been adjudicated neglected, satisfies the constitution's due process requirements. We have applied that same analysis to the proceeding on the respondent's motion to revoke commitment in light of the very different facts of this case. Given the differences in the nature of the proceedings in the two cases and the materially different facts, we conclude that the Michigan Supreme Court's conclusion in *In re Sanders* is inapposite to the present case.

Finally, it is also significant that during oral argument, the respondent conceded that if we were to agree with his one-parent argument, we would have to reverse *In re David L*. The respondent, however, did not request an en banc hearing of this court. "[I]t is axiomatic that one panel of this court cannot overrule the precedent established by a previous panel's holding. . . . This court often has stated that this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc."

(Citation omitted; internal quotation marks omitted.) *State* v. *Carlos P.*, 171 Conn. App. 530, 545 n.12, 157 A.3d 723, cert. denied, 325 Conn. 912, 158 A.3d 321 (2017). Prudence, therefore, dictates that we decline the respondent's invitation to revisit such precedent.

[6] Although he acknowledges that *Stanley* does not address the burden of proof at a hearing to adjudicate the fitness of a parent, the respondent argues that the Supreme Court's subsequent decision in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), makes clear that parents are entitled to a presumption of fitness and the state always bears the burden of proving otherwise. Because the court in *Troxel* addressed a parent's substantive due process rights, we address the respondent's reliance on *Troxel* in part II of this opinion.

[7] General Statutes § 46b-129 (j) (2) provides: "Upon finding and adjudging that any child or youth is uncared for, neglected or abused the court may (A) commit such child or youth to the Commissioner of Children and Families, and such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court; (B) vest such child's or youth's legal guardianship in any private or public agency that is permitted by law to care for neglected, uncared for or abused children or youths or with any other person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage; (C) vest such child's or youth's permanent legal guardianship in any person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage in accordance with the requirements set forth in subdivision (5) of this subsection; or (D) place the child or youth in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court."

[8] Specifically, the court found, "the [respondent] presently has not demonstrated that he can meet Zoey's emotional and medical needs as well as her need for safety. As a result, a reason for commitment continues to exist, and the [respondent], having failed to meet his burden that no cause for commitment exists, his motion to revoke is hereby denied."

---