******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE MARCQUAN C.*
(AC 45087)

Moll, Clark and DiPentima, Js.

*Syllabus*

The respondent mother appealed to this court from the trial court's judgment
denying her motion to revoke the commitment of her minor child to
the custody and care of the petitioner, the Commissioner of Children
and Families. The mother claimed that the court erred in finding that
cause for commitment continued to exist. *Held* that the trial court's
determination that the mother did not meet her burden to prove that
cause for commitment no longer existed was legally correct and factually
supported; there was sufficient evidence in the record to support the
court's conclusion, including the testimony of the petitioner's two wit-
nesses that the mother had not adequately addressed her issues relating
to her ability to collaborate effectively with the Department of Children
and Families and to parent the minor child in a manner that would
afford him both physical and emotional safety.

Argued April 4—officially released May 18, 2022**

*Procedural History*

Petition by the Commissioner of Children and Fami-
lies to adjudicate the respondents' minor child uncared
for, brought to the Superior Court in the judicial district
of New Haven, Juvenile Matters, where the court, *Con-
way, J.*, adjudicated the child uncared for and ordered
protective supervision with custody vested in the respon-
dent mother; thereafter, the court, *Conway, J.*, extended
the period of protective supervision and sustained an
order of temporary custody vesting custody of the minor
child with the respondent father; subsequently, the court,
*Hon. Richard E. Burke*, judge trial referee, vacated the
order of temporary custody and ordered shared custody
and guardianship of the child between the respondent
parents with primary physical custody vesting in the
respondent father; thereafter, the court, *Hon. Richard
E. Burke*, judge trial referee, sustained an order of tempo-
rary custody vesting custody of the minor child in the
petitioner; subsequently, the court, *Hon. Richard E.
Burke*, judge trial referee, granted the motion filed by
the petitioner to open and modify the dispositive order
of protective supervision, and committed the child to the
custody of the petitioner; thereafter, the court, *Conway,
J.*, denied the respondent mother's motion to revoke
commitment, and the respondent mother appealed to
this court, *Bright, C. J.*, and *Prescott* and *Suarez, Js.*,
which dismissed the appeal; subsequently, the court,
*Hon. Richard E. Burke*, judge trial referee, denied the
respondent mother's motion to revoke commitment, and
the respondent mother appealed to this court. *Affirmed.*

*David B. Rozwaski*, assigned counsel, for the appellant
(respondent mother).

*Seon Bagot*, assistant attorney general, with whom, on
the brief, were *William Tong*, attorney general, and *Evan*

*O'Roark* and *Nisa Khan,* assistant attorneys general, for the appellee (petitioner).

*Opinion*

DiPENTIMA, J. The respondent mother, Monica C., appeals from the judgment of the trial court denying her motion to revoke the commitment of her minor child, Marcquan C., to the custody of the petitioner, the Commissioner of Children and Families (commissioner).[1] On appeal, the respondent contends that the court erred in finding that cause for commitment continued to exist. We affirm the judgment of the trial court.

The following facts, which are either undisputed or were found by the court, and procedural history are relevant to our resolution of this appeal. Marcquan C. is the twelve year old child of the respondent and the father. On September 6, 2016, the Department of Children and Families (department) received its first referral concerning Marcquan from the Emergency Mobile Psychiatric Services (EMPS).[2] EMPS had responded to Marcquan's school after receiving a report that Marcquan, who was five years old at the time, was exhibiting destructive behaviors and was attempting to run out of the school building. Marcquan also made concerning statements about bringing a knife to school and about being fearful of returning home because his mother beats him with a belt. EMPS then contacted the respondent, but she refused to go to the school. The respondent told EMPS to contact the department to take Marcquan because she did not want nor did she have time to deal with his behaviors. The commissioner did not take custody of Marcquan at that time and he remained in the care and custody of the respondent. EMPS recommended that the respondent engage Marcquan in mental health treatment at the Yale Child Study Center. Marcquan was subsequently enrolled in therapy at the Yale Child Study Center where he saw an outpatient clinician on a weekly basis.

In November, 2016, the department received its second referral concerning Marcquan. According to the referral from Marcquan's school, Marcquan continued to exhibit out of control behavior and had wrapped a cord around his neck.

On January 13, 2017, the commissioner filed a petition with the Superior Court alleging that Marcquan was being neglected. On May 16, 2017, the neglect petition was orally amended to allege only that Marcquan was uncared for. That same day, the court adjudicated Marcquan uncared for. The court ordered that Marcquan remain in the care and custody of the respondent under protective supervision for a period of six months. On October 12, 2017, the order of protective supervision was extended for an additional six months. The commissioner filed a motion to modify the order from protective supervision to commitment on December 20, 2017. The parties agreed, however, that Marcquan would remain in the respondent's care provided that she (1) permit the department access to her home, (2) sign releases, and (3) cooperate

with the department in securing a male mentor for Marcquan.

On February 5, 2018, Marcquan appeared in school with a swollen eye and lines resembling belt marks on his temple. The respondent admitted to disciplining Marcquan by "beating" him on the buttocks with a belt. The respondent theorized that while doing so, she might have inadvertently struck him on the head with the belt. According to Marcquan, this was not an isolated incident. Marcquan expressed concern that one day the respondent would get so mad that she might shoot him.

On February 7, 2018, the department filed an affidavit seeking permission to place Marcquan in an out-of-home placement. The affidavit alleged that the respondent had "exerted excessive physical discipline on [Marcquan]," that she was "unable to control her impulses," and that she had "unaddressed mental health issues." That same day, the court vested temporary custody of Marcquan with his father. On April 11, 2018, with the parties' consent, the court vacated the order of temporary custody. The court ordered that the father and the respondent share custody and guardianship of Marcquan, with the father having primary physical residence. Protective supervision remained in place until August 11, 2018.

Nevertheless, on July 10, 2018, at an in-court review hearing, the father reported that he could no longer care for Marcquan due to Marcquan's out of control behavior. As a result, the department invoked a ninety-six hour hold of Marcquan. On July 12, 2018, the court concluded that Marcquan was "in immediate physical danger from [his] surroundings," "[a]s a result of said conditions, [his] safety [was] endangered and immediate removal from such surroundings [was] necessary to ensure [his] safety," and "continuation in the home [was] contrary to [his] welfare." The court therefore vested temporary care and custody of Marcquan with the commissioner. The court also set forth specific steps to facilitate reunification between the respondent and Marcquan.[3]

On July 17, 2018, the commissioner filed a motion to open and modify the order of protective supervision and to modify the disposition to an order of commitment. In support of the motion, the commissioner incorporated, by reference, an affidavit prepared by a department social worker dated July 12, 2018. The affidavit provided that Marcquan's father had informed the court that he could no longer care for Marcquan and that the respondent was admitted to a local hospital under observation and thus was also unable to care for Marcquan. According to the affidavit, there were no other known potential family resources for Marcquan. The affidavit concluded that Marcquan had "no responsible caretaker to provide for his needs and immediate removal from such surroundings [was] necessary to ensure the child's safety."

A hearing was held on July 27, 2018, and the court granted the commissioner's motion to modify the order of protective supervision and committed Marcquan to the care and custody of the commissioner. Since that time, Marcquan has remained committed to the care and custody of the commissioner, and the father has had no further involvement with the department. Marcquan was placed in nonrelative foster care until September 4, 2019, when he was placed with his godmother.

On September 30, 2019, the respondent filed her first motion to revoke commitment of Marcquan to the care and custody of the commissioner. Before the court held a hearing on the motion to revoke commitment, the commissioner filed a motion, on October 19, 2019, seeking a psychological evaluation of both Marcquan and the respondent. The court held a hearing on the commissioner's motion for psychological evaluation on October 29, 2019. The court subsequently denied the motion based on its belief that issuing a court-ordered psychological evaluation would be futile due to the respondent's refusal to cooperate.

The court held a hearing on the respondent's first motion to revoke commitment on November 25, 2019, and December 18, 2019. On December 26, 2019, the court, *Conway, J.*, issued a memorandum of decision. The court found that, although the respondent participated in supervised visits with her son, she continued to make inappropriate comments and to engage in inappropriate conversations in Marcquan's presence. Additionally, she failed to develop skills or a working knowledge of positive and effective forms of discipline. The court also found that the respondent struggled to collaborate effectively with social workers from the department, noting that, by September, 2019, the case had been assigned to the department's sixth social worker. The court further determined that any benefits the respondent had derived from her weekly counseling sessions were not "carrying over" to her reunification efforts with Marcquan or her ability to properly care for him. The court found that there had been no discernable improvement regarding the respondent's ability to conform her behavior so as to make it in Marcquan's best interest to return to her care. The court explained that without a credible psychological evaluation, it was impossible to understand or predict how the respondent would react to and with others, including Marcquan. The court further explained that "past and present reality has stalled Marcquan's return to [the respondent's] care and has undoubtedly negatively impacted Marcquan's fragile well-being." The court thus reconsidered its prior denial of the commissioner's motion for a psychological evaluation and ordered the respondent to participate in a court-ordered psychological evaluation.

On the basis of the record before it, the court denied the first motion to revoke commitment on the ground

that the respondent failed to establish that cause for commitment no longer existed. The court explained that the respondent "has to understand that until she demonstrates an ability to collaboratively and effectively interact with [the department] and service providers and she demonstrates a sustained ability to parent Marcquan in a manner which affords him both physical and emotional safety, reunification is highly unlikely. While no guarantee, her participation in a court-ordered evaluation and her sustained and effective follow through with treatment recommendations may potentially be the key to a reinvigorated reunification process."

The respondent then appealed from the court's order requiring her to participate in a psychological evaluation. This court dismissed the respondent's appeal, concluding that the order for a psychological evaluation was not part of the court's judgment denying the respondent's motion to revoke commitment and was not otherwise an appealable final judgment. See *In re Marcquan C.*, 202 Conn. App. 520, 523, 246 A.3d 41, cert. denied, 336 Conn. 924, 246 A.3d 492 (2021). A court-ordered psychological evaluation never occurred. Rather, the respondent arranged her own psychological evaluation with Ralph Balducci, a psychologist.

On April 26, 2021, the respondent filed her second motion to revoke commitment, which is the subject of the present appeal. The court held a hearing on the motion on July 1, 2021. At the beginning of the hearing, the court granted the commissioner's motion for judicial notice concerning prior hearings. The respondent called Balducci as a witness before testifying herself. The commissioner called Lucy Hernandez, Marcquan's therapist, and Andre Turner, a social worker previously assigned to the case, to testify.

In a memorandum of decision dated September 21, 2021, the court, *Hon. Richard E. Burke*, judge trial referee, concluded that grounds for commitment continued to exist and, therefore, denied the respondent's motion to revoke commitment. The court incorporated by reference the memorandum of decision, dated December 26, 2019, denying the respondent's first motion to revoke commitment. The court also made the following additional findings of fact: "The respondent mother stated that she gets 'triggered' by [the department]. At one visit to the [department] offices on May 7, [2021] she was asked by security to take out her identification from her wallet to show it. The respondent mother thought that seeing it through the plastic opening in her wallet should be sufficient. Security did not agree and the respondent mother got 'triggered.' In addition to using racially charged language, the respondent mother told the [department] social worker that she would have him 'touched,' which he stated was a serious threat of harm. This took place in the presence of Marcquan. In the prior memorandum of decision denying [the respon-

dent's] motion to revoke, [the court] stated that: 'The respondent mother has to understand that until she demonstrates an ability to collaboratively and effectively interact with [the department] and service providers and she demonstrates a sustained ability to parent Marcquan in a manner which affords him both physical and emotional safety, reunification is highly unlikely.' . . . Without question, [the respondent] has been unwilling or unable to collaborate with [the department]. Her behavior has gone far beyond a lack of collaboration." The court therefore concluded that grounds for commitment continued to exist and denied the respondent's second motion to revoke commitment. This appeal followed.[4]

We begin by setting forth the legal principles and standard of review that govern our analysis of the respondent's claim on appeal. "A motion to revoke commitment is governed by [General Statutes] § 46b-129 (m) and Practice Book § 35a-14A. Section 46b-129 (m) provides: 'The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months.'" *In re Zoey H.*, 183 Conn. App. 327, 344, 192 A.3d 522, cert. denied, 330 Conn. 906, 192 A.3d 425 (2018).

"Pursuant to § 46b-129 (j) (2), a trial court, prior to awarding custody of [a] child to the department pursuant to an order of commitment . . . must both find and adjudicate the child on one of three [statutorily defined] grounds: uncared for, neglected or [abused]. . . . Adjudication on any of these grounds requires factual support, and [t]he trial court's determination thereafter as to whether to maintain or revoke the commitment is largely premised on that prior adjudication. . . . Accordingly, [t]he court, in determining whether cause for commitment no longer exists . . . look[s] to the original cause for commitment to see whether the conduct or circumstances that resulted in commitment continue to exist." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Santiago G.*, 318 Conn. 449, 470, 121 A.3d 708 (2015).

Practice Book § 35a-14A provides in relevant part: "Where a child or youth is committed to the custody of the [c]ommissioner . . . the commissioner, a parent or the child's attorney may file a motion seeking revocation of commitment. The judicial authority may revoke commitment if a cause for commitment no longer exists and it is in the best interests of the child or youth. Whether to revoke the commitment is a dispositional question, based on the prior adjudication, and the judicial authority shall determine whether to revoke the commitment upon a fair preponderance of the evidence.

The party seeking revocation of commitment has the burden of proof that no cause for commitment exists. If the burden is met, the party opposing the revocation has the burden of proof that revocation would not be in the best interests of the child. . . ."

"Pursuant to § 46b-129 (m) and Practice Book § 35a-14A, the moving party bears the burden of proving that a cause for commitment no longer exists; if he or she is successful, the court then must determine whether revocation of commitment is in the best interest of the child." *In re Zoey H.*, supra, 183 Conn. App. 344–45.

"Our Supreme Court has held that a natural parent, whose child has been committed to the custody of a third party, is entitled to a hearing to demonstrate that no cause for commitment still exists. . . . The initial burden is placed on the [person] applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. . . . If the party challenging the commitment meets that initial burden, the commitment to the third party may then be modified if such change is in the best interest of the child. . . . The burden falls on the persons vested with guardianship to prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal quotation marks omitted.) Id., 350–51.

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . The determinations reached by the trial court . . . will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Brooklyn O.*, 196 Conn. App. 543, 548, 230 A.3d 895 (2020). In the present appeal, the respondent does not challenge any specific factual finding made by the trial court. As a result, we review the record to determine whether the trial court's conclusion was legally correct and factually supported.

The respondent claims that the trial court erred in denying her second motion to revoke commitment.[5] Specifically, the respondent contends that "the trial court in its decision essentially found that cause for commitment continued to exist because of the respondent's inability to effectively work with [the department]." In her view, the trial court only referenced "one specific instance as a factual basis to support this finding which was the [department] office visit."[6] We conclude that there was sufficient evidence in the record to support the court's conclusion that cause for commitment still existed.

At the hearing on the respondent's second motion to

revoke commitment, the court heard testimony from Lucy Hernandez, Marcquan's therapist. Hernandez testified that Marcquan was very quiet and withdrawn, but, depending on his placement, his mood would change. Hernandez explained that Marcquan was diagnosed with dysthymia, a depressive order, the symptoms of which include a depressed mood, irritability, anger, low self-esteem, and appearing withdrawn. When asked whether Marcquan's symptoms were ever exacerbated or aggravated after interaction with the respondent, Hernandez testified: "I clinically believe that there are some impacts of his behavior and his mood. I think a lot of it has to do with frustration and irritability that he has described in sessions of whether it be feeling stuck in between, but also [split] amongst individuals." Hernandez also testified that Marcquan generally became more withdrawn after his visits with the respondent. According to Hernandez, Marcquan has stated that he was not interested in engaging in family therapy because he would not want the respondent to hurt Hernandez' feelings. Hernandez testified that Marcquan needs a nurturing, structured environment.

The court also heard the testimony of Andre Turner, a social worker employed by the department who previously had been assigned to the case in May, 2020, but then subsequently was removed from the case due to threats made by the respondent. According to Turner, the commissioner's main concern regarding the respondent was her history of physically and verbally abusing Marcquan. Turner testified that the respondent had not participated in a court-ordered psychological evaluation, despite Judge Conway's order to do so.[7] When asked about the lack of visitation between the respondent and Marcquan, Turner testified that Marcquan did not want any in-person visits with the respondent because of the respondent's history of negative behavior. Turner further testified that during one in-person visit in May, 2021, after the respondent arrived at the department office, an incident occurred between the respondent and a security guard. According to Turner, the security guard advised the respondent that she was required to show him her identification, and the respondent showed it to him through her clear wallet. Turner testified that the security guard then asked the respondent to take her identification out of the wallet, at which point the respondent started to become disagreeable. Turner averred that he advised the respondent that if she was unable to follow the security guidelines, then he would not be able to facilitate the visit. According to Turner, the respondent then began to scream at him, called him names, made racist and derogatory remarks, and threatened him. Marcquan witnessed the entire incident and began crying. Turner also testified that the respondent had a history of making inappropriate statements in the presence of Marcquan, and that he was not the first social worker to whom the respondent

had made derogatory comments. Finally, when asked whether the respondent had accomplished some of the court-ordered specific steps, Turner testified "no."

On the basis of our review of the record, we conclude that the court's determination that the respondent did not meet her burden to prove that cause for commitment no longer existed was legally correct and factually supported. The testimony of the commissioner's two witnesses provided sufficient evidence from which the court could have found that cause for commitment continued to exist. Specifically, the testimony supported the court's conclusion that the respondent had not adequately addressed her (1) issues relating to her ability to collaborate effectively with the department, and (2) ability to parent Marcquan in a manner that would afford him both physical and emotional safety.[8]

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** May 18, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The mother, Monica C., is hereinafter referred to as the respondent. The father, Mark B., although also a respondent in the underlying proceedings, is not participating in this appeal and for clarity is hereinafter referred to as the father.

The attorney for the minor child has submitted a statement, pursuant to Practice Book § 79a-6 (c), adopting the commissioner's brief on appeal.

[2] EMPS is a community based emergency service intended to provide children and families with immediate access to in-person care when a child is experiencing an emotional or behavioral crisis. EMPS is funded by the department.

[3] The specific steps set forth by the court on July 12, 2018, instructed the respondent: (1) to keep all appointments set by or with the department and to cooperate with home visits by the department or Marcquan's attorney; (2) to inform the department of her and Marcquan's location at all times; (3) to take part in counseling and to make progress toward identified treatment goals; (4) to submit to random drug testing; (5) to refrain from the use of illegal drugs and the abuse of alcohol or medicine; (6) to cooperate with service providers; (7) to cooperate with court-ordered evaluations or testing; (8) to sign releases allowing the department to communicate with service providers to check on attendance, cooperation, and progress towards identified goals; (9) to sign releases allowing Marcquan's attorney to review her medical, psychological, psychiatric, and educational records; (10) to maintain adequate housing and legal income; (11) to notify the department concerning any changes in the makeup of her household to make sure that the change would not hurt the health and safety of Marcquan; (12) to cooperate with any restraining or protective order or safety plan approved by the department to avoid domestic violence incidents; (13) to attend and complete an appropriate domestic violence program; (14) to not get involved with the criminal justice system and to follow any conditions of probation or parole; (15) to visit Marcquan as often as the department permitted; (16) to inform the department of any person she would like the department to investigate and to consider as a placement resource for Marcquan; and (17) to tell the department the names and addresses of the grandparents of Marcquan.

[4] The respondent appeals only from the judgment of the trial court denying her second motion to revoke commitment.

[5] Although the respondent argues that the court erred in denying her second motion to revoke commitment, she concedes that revocation would not necessarily be in the child's best interests at this time because the

commissioner has not properly engaged the respondent and her child with appropriate services. The respondent requests that this court reverse the judgment of the trial court denying her second motion to revoke commitment, "remand the case back to the trial court with instructions to stay the decision on the motion to revoke, and order the parties to fully cooperate with a court-ordered psychological evaluation to include the respondent, the minor child, and if appropriate, an interactional between the respondent and child, and to follow the recommendations of the evaluator, and then to hear additional evidence on the outcome of the implementation of the recommendation before issuing a final ruling." We reject the respondent's particular request for relief because we affirm the judgment of the trial court.

[6] The respondent also argues, in the alternative, that "it was not clearly demonstrated that it was in the best interest of the child to deny the motion to revoke when appropriate services to facilitate reunification were not implemented." We note, however, that the party seeking revocation of commitment has the burden to prove that no cause for commitment exists. Only if the movant satisfies that burden does the burden shift to the party opposing the revocation to show that revocation would not be in the best interests of the child. See *In re Zoey H.*, supra, 183 Conn. App. 344. We need not address this argument because we affirm the court's conclusion that the respondent failed to satisfy her burden of proving that no cause for commitment continued to exist.

[7] In its memorandum of decision, the court found that the respondent credibly argued that, at some point, the department did not cooperate with the court-ordered psychological evaluation as it related to the child-parent relationship.

[8] The respondent also argues that she "did demonstrate that she continued to be engaged in ongoing therapy and that contrary to . . . Turner's testimony that [she] had not addressed the concerns regarding her anger issues and its impact on parenting, [she] offered expert testimony to the contrary." However, "we repeatedly have held that [i]n a [proceeding] tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . Where there is conflicting evidence . . . we do not retry the facts or pass on the credibility of the witnesses. . . . The probative force of conflicting evidence is for the trier to determine." (Internal quotation marks omitted.) *Arroyo* v. *University of Connecticut Health Center*, 175 Conn. App. 493, 513, 167 A.3d 1112, cert. denied, 327 Conn. 973, 174 A.3d 192 (2017); see also *In re Brooklyn O.*, supra, 196 Conn. App. 548 ("[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses" (internal quotation marks omitted)).

———————————————