******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE A. H. ET AL.*
## (AC 47052)

Bright, C. J., and Clark and Seeley, Js.

*Syllabus*

The respondent father appealed to this court from the judgments of the
trial court terminating his parental rights with respect to his minor
children, A and K. Following the court's adjudication of A as neglected,
the court ordered the father and the respondent mother, C, to undergo
a psychological evaluation conducted by L, a clinical psychologist. Fol-
lowing K's birth, the petitioner, the Commissioner of Children and Fami-
lies, filed a neglect petition for K, and the father and C both participated
in an evaluation with R, a court-appointed psychological evaluator. At
the start of the consolidated trial on the termination of parental rights
petitions for both children and the neglect petition for K, counsel for
C addressed the court regarding C's motion in limine. The motion, joined
by the father's counsel, challenged various hearsay statements in the
petitioner's exhibits, including, inter alia, statements or information
within multiple social studies prepared by the Department of Children
and Families and status reports that derived from L's evaluation. The
trial court denied the motion and overruled the objections to the hearsay
statements except with statements made by A, which the court con-
cluded were not admissible. The court considered this information in
both the adjudicatory and dispositional phases of the termination of
parental rights proceedings and concluded that the father had failed to
achieve such degree of personal rehabilitation as would encourage the
belief that within a reasonable period of time, given and ages and needs
of the children, he could assume a responsible position in their lives.
On appeal, the father claimed, inter alia, that the court's reliance on
the social studies submitted into evidence by the petitioner during the
adjudicatory phase of the trial constituted both a violation of the applica-
ble statute (§ 45a-717) and rule of practice (§ 35a-9). *Held*:

1. The trial court's use of and reliance on the social studies in the adjudicatory
phase of the trial was not improper; this court was bound by its precedent
in *In re Tabitha P.* (39 Conn. App. 353), which held that a court properly
may rely on a social study in the adjudicatory phase of a termination
of parental rights proceeding, and the respondent father failed to seek
en banc review of his appeal to overrule that precedent.

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the court.

2. This court declined to review the respondent father's unpreserved claim that the trial court's consideration of the social studies during the adjudicatory phase of the trial violated his rights to due process; the claim challenged the admission of the social studies and thus was evidentiary in nature and not of constitutional magnitude, and, thus, it was not reviewable pursuant to the second prong of *State* v. *Golding* (213 Conn. 233).

3. The respondent father could not prevail on his claim that the trial court improperly admitted hearsay evidence contained in the petitioner's exhibits, specifically the multiple social studies and status reports that derived from L's psychological evaluation and statements from the children's foster mother, and that the alleged hearsay was harmful: assuming, without deciding, that the testimony was improperly admitted into evidence, the father has failed to demonstrate the harmfulness of the challenged hearsay as it was cumulative of other properly admitted evidence, including testimony from a social worker regarding the father's inconsistent participation in recommended services, his inability to provide for the children's safety and well-being, and concerns as to his parenting skills, mental health and substance abuse, testimony from R including, inter alia, that the father would not shield the children from the adverse impact of C's behavior and that he suffered from a personality disorder, and the psychological evaluation performed by R, which was admitted as a full exhibit without objection and which set forth information that was cumulative of alleged hearsay statements from L and referenced a separate evaluation of the father that made an identical statement to the one in L's evaluation but to which the father did not object; moreover, the alleged hearsay statements of the foster mother were also cumulative of other evidence in the record, including testimony from a visitation supervisor and a social worker and R's evaluation.

Argued March 4—officially released June 3, 2024**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Hoffman, J.*; judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

** June 3, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Nisa Khan*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

SEELEY, J. The respondent father,[1] Terrel H., appeals from the judgments of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families (commissioner), terminating his parental rights with respect to his minor children, A. H. (A) and K. H. (K). On appeal, the respondent claims that (1) the court's reliance on social studies prepared by the Department of Children and Families (department) in the adjudicatory phase of the trial violated General Statutes § 45a-717 and Practice Book § 35a-9, despite this court's holding in *In re Tabitha P.*, 39 Conn. App. 353, 664 A.2d 1168 (1995), (2) the court's use of the social studies in the adjudicatory phase violated his due process rights, and (3) the court improperly admitted hearsay evidence contained in exhibits submitted by the commissioner, and the admission of that evidence was harmful to the respondent. We disagree with the respondent's claims and, accordingly, affirm the judgments of the court.

The following relevant facts, which the court found by clear and convincing evidence, and procedural history are relevant to this appeal. A, the second child of the respondent and Alexandria C., was born in May, 2018. At that time, Alexandria C. was incarcerated and a petition for the termination of the parental rights of the respondent and Alexandria C. had been filed as to

[1] The parental rights of Alexandria C., the respondent mother of the minor children, also were terminated with respect to both children. She has not appealed from those judgments. All references in this opinion to the respondent are to Terrel H. only.

their first child, E. H. (E). Thus, immediately following A's birth, on May 25, 2018, the commissioner sought an order of temporary custody for A, which was granted that day and sustained on May 31, 2018. Also on May 25, 2018, the commissioner filed a neglect petition with respect to A, and the court ordered specific steps for the respondent to facilitate his reunification with A.[2]

A consolidated trial was held with respect to the termination petition concerning E and the neglect petition concerning A. On January 11, 2019, the court rendered judgments terminating the respondent's parental rights as to E and adjudicating A neglected and committing her to the custody of the commissioner until further order of the court. On December 4, 2019, the commissioner filed a petition to terminate the respondent's parental rights as to A. The petition alleged that reasonable efforts had been made to reunify the respondent with A, that the respondent was unable or unwilling to benefit from reunification efforts, and that reasonable efforts to reunify were not required because the court previously had approved a permanency plan other than reunification in accordance with General Statutes § 17a-111b. The petition further alleged that A had been found in a prior proceeding to have been neglected, abused, or uncared for and that the respondent had failed to achieve the degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of A, the respondent could assume a responsible position in her life.

[2] The specific steps ordered the respondent, inter alia, to keep all appointments set by or with the department; to take part in counseling and make progress toward parenting and individual treatment goals, specifically, to maintain stable mental health and learn appropriate parenting skills; to submit to a substance abuse evaluation and follow the recommendations about treatment; not to use illegal drugs or abuse alcohol or medicine; to cooperate with service providers recommended for parenting/individual/ family counseling; to get and/or maintain adequate housing and a legal income; not to get involved with the criminal justice system; and to visit with the children as often as the department permits.

In February, 2021, the court ordered the respondent and Alexandria C. to undergo a psychological evaluation to help determine (1) "the present relationship between each parent and [A]," (2) whether "[t]he parents have a good understanding of [A's] needs and the capacity to meet them," (3) which permanent placement would be in A's best interest, and (4) whether the parents could "achieve such a degree of rehabilitation as would encourage the belief that, within a reasonable period of time, they could resume a responsible position in the life of [A]." The evaluation was conducted by Dr. Wendy Levy, a clinical psychologist, in August, 2021.

In December, 2021, the respondent and Alexandria C.'s third child, K, was born. On December 27, 2021, the commissioner sought an order of temporary custody, which the court granted that day and sustained on January 6, 2022. Subsequently, the commissioner filed a neglect petition with respect to K. Also on December 27, 2021, the court ordered specific steps for the respondent to facilitate his reunification with K.[3] On June 20, 2022, the commissioner filed a petition to terminate the respondent's parental rights as to K. The petition alleged that the department had made reasonable efforts to reunify K with the respondent, that the respondent was unable or unwilling to benefit from reunification efforts, and that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the age and needs of K, he could assume a responsible position in her life.

In January, 2023, the respondent and Alexandria C. both participated in an evaluation with Dr. Kelly F. Rogers, a court-appointed psychological evaluator. Dr.

_____

[3] The December 27, 2021 specific steps were similar to the May 25, 2018 specific steps; see footnote 2 of this opinion; with an updated treatment goal of gaining an understanding "of the importance of stability . . . in the life of a child."

Rogers' evaluation concluded that the respondent "evinces a long-standing pattern of maladaptive behavior characterized by criminal activity, impulsive action and decision-making, negativity and resistance to influence. He has few effective coping skills, and external pressures episodically make him 'overwhelmed.' Perceiving himself to be the victim of cruel fate and an uncaring society, he has few qualms about violating rules and proscriptions to gain the rewards of which he feels he has been cheated. He accepts little blame for his action[s], inaction and circumstances. Though his decisions and behavior have brought him little satisfaction or reward, he remains resistant to self-examination or change. His unenviable situation has made him sour on life, and he has little joy or satisfaction. Findings support a primary diagnosis of [o]ther [s]pecified [p]ersonality [d]isorder ([p]assive-[a]ggressive, [n]arcissistic and [a]ntisocial [t]raits with inadequate information for diagnosis of a specific personality disorder). His present unhappiness is best described as an [a]djustment [d]isorder with [d]epressed [m]ood." Dr. Rogers further opined that, although the respondent "could potentially serve as an appropriate caretaker" if he were no longer in a relationship with Alexandria C., he was too strongly "enmeshed" with her to "be expected to shelter [their children] from her volatility and its attendant risks. Any representations he makes about willingness to divorce himself from [Alexandria C.] to care for [the children] should be regarded skeptically, and because of the likelihood of his failing to protect [the children] from [Alexandria C.'s] adverse impact, termination of his parental rights is . . . most consistent [with the children's] psychological well-being."

A consolidated trial on the termination of parental rights petition for A and the neglect and termination of parental rights petitions for K was held on July 10 and 14 and August 7, 2023. During the trial, the commissioner

presented testimony from the following witnesses: Susan Allen, the assistant director of Safeway Family Services; Haley Flax, a department social worker; and Dr. Rogers. Alexandria C. testified, and called as a witness M'Kayla Gay, a friend of hers. The respondent did not testify or call any witnesses.

On the first day of trial, before any witnesses were called, counsel for Alexandria C. addressed the court, *Hoffman, J.*, regarding her motion in limine, filed on July 10, 2023. Counsel for the respondent joined in the motion, which challenged various hearsay statements in the commissioner's exhibits, including, inter alia, statements or information within multiple social studies[4] and status reports that derived from Dr. Levy's 2021 psychological evaluation, statements of the children's foster mother contained in those documents, and statements attributable to A.[5] The commissioner argued in

[4] A social study is a document prepared by the department that compiles relevant information regarding the respondent's history with the department, including notes from caseworkers, medical professionals, visit supervisors, and other relevant parties. See *In re Gabriel C.*, 196 Conn. App. 333, 358, 229 A.3d 1073 ("'[t]he purpose of the social study is to put parents on notice of allegations that need to be explained or denied' "), cert. denied, 335 Conn. 938, 248 A.3d 708 (2020). In a termination of parental rights proceeding, there may be multiple social studies produced by the department as the case develops and the department's goals progress (i.e., shift from reunification to termination, or vice versa).

[5] Specifically, during argument on the motion in limine, counsel for the respondent orally joined in the motion, arguing that "any statements that come from someone who is not testifying is hearsay. We do not have the ability to cross-examine them." In response to the motion in limine, with respect to the statements from Dr. Levy's report contained within various department exhibits, counsel for the commissioner argued that Dr. Levy's report was "part of the court file. . . . [H]er report is part of the department's record. The department has put [Dr. Levy's] record within its own business record. The court is able to take judicial notice of any part of the court file that the court deems appropriate at any time. Dr. Rogers additionally relied on Dr. Levy's report." The court overruled the respondent's objection and admitted the statements from Dr. Levy's report, stating that "[t]he report was relied on by Dr. Rogers in preparing his report. . . . [C]ounsel can go ahead and question Dr. Rogers on what he relied on of Dr. Levy's report . . . ."

opposition that certain of the challenged statements were admissible under the business records exception to the rule against hearsay.

Following argument on the motion in limine, the trial court denied the motion and overruled the objections to the hearsay statements contained within the exhibits, except with respect to statements made by A, which the court concluded were not admissible. As a result, the following department social studies and reports were admitted as full exhibits over objection from Alexandria C. and the respondent: exhibit three, a social worker affidavit dated December 27, 2021; exhibit seven, a study in support of the permanency plan dated August 17, 2021; exhibit eight, a social study in support of the termination petition for K dated June 14, 2022; exhibit nine, a status report dated September 6, 2022; exhibit ten, a study in support of the motion to support the permanency plan dated September 16, 2022; exhibit eleven, an addendum to a social study in support of the

The court next addressed statements from Joel Tudisco in exhibit three, a social worker affidavit dated December 27, 2021, in which Tudisco, an advanced practice registered nurse who has provided psychiatric care for Alexandria C. since June, 2020, commented on Alexandria C.'s medication management and her mental health issues, and expressed concerns about Alexandria C.'s use of medical marijuana. Counsel for the commissioner argued that the statements should be admitted as a business record, as they were made "pursuant to a valid release" and were "collected [by the department] in the ordinary course of business." Counsel for Alexandria C. reiterated the objection, arguing that "[i]t's not a business record exception. They will repeat this completely, all throughout. . . . I mean, everything that is contained in [the department] arguably is subject to being admitted because it's in their business records. That's not what the hearsay rule is about." The court overruled the objection and allowed the statements in as "part of the medical evaluation."

At that point, there was an exchange between counsel for Alexandria C. and the court regarding the remaining objections. Counsel indicated that he would be making the "same argument" for the remaining objections and, therefore, chose not to proceed paragraph by paragraph through the rest of the motion in limine. The court proceeded to overrule the remaining objections, with the exception of the statements made by A.

termination petitions dated September 8, 2022; exhibit twelve, a status report dated November 28, 2022; exhibit thirteen, a status report dated December 16, 2022; exhibit fourteen, a status report dated January 20, 2023; exhibit fifteen, a status report dated January 23, 2023; exhibit sixteen, an addendum to a social study in support of the termination petitions dated April 21, 2023; and exhibit seventeen, an addendum to a social study in support of the termination of parental rights petitions dated June 27, 2023.

Although the motion in limine raised hearsay objections regarding exhibit eighteen, a preliminary report from Dr. Rogers, and exhibit nineteen, the court-ordered psychological evaluation from Dr. Rogers, the motion in limine asserted that there would be no objection to those exhibits so long as Dr. Rogers testified, which he did. No further objection was raised concerning the admission of those two exhibits.

On September 1, 2023, the court issued a memorandum of decision in which it adjudicated K neglected and terminated the respondent's parental rights as to A and K. After setting out the procedural history and finding that it had jurisdiction, the court stated that it had "carefully considered the termination of parental rights petition[s], the criteria set forth in the relevant General Statutes, the applicable case law, as well as the evidence and testimony presented, the demeanor and credibility of the witnesses, the evidence, and the arguments of counsel according to the standards of law. With [regard] to the termination of parental rights petition[s], the court makes its findings by clear and convincing evidence."

Relevant to the adjudicatory phase[6] of the termination proceeding, the court made the following findings concerning the respondent. The respondent became

_____

[6] "Proceedings to terminate parental rights are governed by . . . [General Statutes] § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the

involved with the department in 2016, when he was caring for E. "In April, 2016, there was a Careline[7] report over concerns that [the respondent] was on parole stemming from a conviction for robbery, was using marijuana, and . . . was not providing adequate supervision for [E]. [E] was removed from [the respondent's] care in April, 2016.

"In May, 2016, [the respondent] was incarcerated due to a violation of probation and remained in prison until June, 2016. Upon his release, [the department] referred him for parenting education and substance abuse/mental health assessment in December, 2016.

"In December, 2016, [the respondent] absconded from the halfway house and was considered a fugitive on the run until he was found hiding in [Alexandria C.'s] basement. [The respondent] was discharged to the Isaiah House in June, 2017. The department referred [the respondent] to the Renaissance Program on several occasions for a full assessment of his needs, however, he failed to participate in any services until October, 2018. . . .

"On January 11, 2019, [the respondent's parental] rights were terminated as to [E]. Following the termination of his parental rights, [the respondent] was minimally engaged in case planning; he was discharged from

dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (B) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 476 n.5, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

[7] "'Careline is a department telephone service that mandatory reporters and others may call to report suspected child abuse or neglect.' *In re Katherine H.*, 183 Conn. App. 320, 322 n.4, 192 A.3d 537, cert. denied, 330 Conn. 906, 192 A.3d 426 (2018)." *In re Anthony S.*, 218 Conn. App. 127, 136 n.9, 290 A.3d 901 (2023).

the Renaissance Program and failed to maintain consistent contact with the department. [The respondent] did not reengage with the department until January, 2020, although he refused to discuss services until July, 2020, at which time he was referred to [Community Health Resources]. [The respondent] completed the services offered by [Community Health Resources], but [Community Health Resources] did not conduct urine screens and [the respondent] admitted to continued marijuana use.

"From January, 2021, to December, 2021, the department recommended [that the respondent] attend services and assessments at [Community Health Resources]. [The respondent] did not complete the intake until the day [K] was born. [The respondent] was diagnosed with cannabis use disorder, moderate, and tobacco use disorder, mild. [The respondent] was recommended to engage in services with [Community Health Resources], however, his last kept appointment with [Community Health Resources] was in March, 2022 . . . . [A]ll appointments since then have been no shows, and he was unsuccessfully discharged [in] October, 2022. [The respondent] was recommended to complete an updated mental health and substance abuse evaluation . . . . To date, [the respondent] is not engaged in treatment. There are concerns that [the respondent] minimizes his marijuana use, and he is noted to arrive at supervised visits, court dates and appointments, smelling strongly of marijuana and perfume.

"In January, 2023, [the respondent] participated in a court-ordered psychological evaluation with [Dr. Rogers]. Dr. Rogers indicated that his diagnostic impressions of [the respondent] included other specified personality disorder, noting passive-aggressive,

narcissistic, and antisocial traits but [that he] had inadequate information for [a] diagnosis of a specific personality disorder. He reported [that the respondent's] present unhappiness is best described as an adjustment disorder with depressed mood. Dr. Rogers stated that [the respondent] 'accepts little blame for his actions, inaction and circumstances, and remains resistant to self-examination or change.' He indicated that [the respondent] could potentially benefit from individual psychotherapy, although noting that, given [the respondent's] 'resistance to influence, the prognosis for meaningful engagement is guarded.' Dr. Rogers opined that [the respondent] is 'largely resistant to efforts at education and remediation' and 'has made little adjustment in his circumstances to encourage the belief that, within a reasonable period, he could assume the role of caretaker for either child.' Dr. Rogers further opined that [the respondent] 'fails to recognize [Alexandria C.'s] serious limitations and the impact of her labile emotions and behavior'[8] and is likely to permit such behavior to continue in the [children's] presence. [The respondent] continues to maintain a relationship with [Alexandria C.], and they continue to reside in an apartment together. [The respondent] reported that he worked for Target in April, 2022, but the department does not have an update as to his current employment status." (Footnotes added.)

After making those findings, the court addressed the statutory ground of failure to rehabilitate. With respect to the respondent, the court stated: "As to personal

---

[8] Alexandria C. has a documented history of erratic and problematic behavior. Despite the multitude of services offered to her over the years, she has struggled to regulate her behavior appropriately, including while interacting with her and the respondent's children. Although she is not a party to this appeal; see footnote 1 of this opinion; department social workers and clinical evaluators, such as Dr. Rogers, expressed concern over the respondent's ongoing relationship with Alexandria C. and his inability to understand the negative impact her behavior has on the children.

rehabilitation . . . [the respondent] has attempted to engage in services for many years to address his substance use and mental health issues. [He] has also historically engaged in, and completed, numerous parenting programs. His participation has been inconsistent, and his progress is limited. [He] has a history of unaddressed mental health needs, substance abuse, parenting deficits, and transient housing. [He] has not complied with his specific steps and has not successfully engaged in services and, therefore, has not achieved sufficient rehabilitation." The court also noted its continued "concerns regarding [the respondent's] insight into [Alexandria C.'s] behaviors, which impacts his ability to safely care for his children." The court further concluded that the respondent does not have "the stability in [his] own [life] to enable [him] to care for [A] and [K]. [The respondent] has [not] made significant progress toward personal rehabilitation and clearly cannot assume a responsible position in [the children's] lives considering their age[s] and needs." The court explained: "Of paramount consideration to the court is the issue of stability and permanency for [the children]. . . . [Their] need for permanence far outweighs any remote chance that . . . [the respondent] may rehabilitate in the far distant future. . . . [The respondent has] . . . failed to successfully accomplish what was needed to consider reunification as an appropriate conclusion. [A] and [K] cannot wait for their parents to rehabilitate." (Citation omitted.)

Accordingly, the court concluded, by clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent with A and K, that the respondent was unable or unwilling to benefit from those reunification efforts, and that the respondent had "failed to gain the necessary insight needed to care for [A] and [K]" Furthermore, the court determined, by clear and convincing evidence, that the

respondent had failed to achieve the degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, given the ages and needs of A and K, the respondent could assume a responsible position in their lives.

In the dispositional phase of the termination of parental rights trial; see footnote 6 of this opinion; the court considered and made the requisite factual findings pursuant to General Statutes § 17a-112 (k)[9] and concluded that the commissioner had proven by clear and convincing evidence that terminating the respondent's parental rights was in the children's best interests. Accordingly, the court granted the petitions and rendered judgments terminating the respondent's parental rights. This

[9] General Statutes § 17a-112 (k) provides in relevant part: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the [d]epartment . . . has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

appeal followed. Additional facts will be set forth as necessary.

We first set forth the following relevant legal principles governing termination of parental rights proceedings. "A hearing on a termination of parental rights petition consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the court must determine whether the [petitioner] has proven, by clear and convincing evidence, a proper ground for termination of parental rights. . . . In the dispositional phase, once a ground for termination has been proven, the court must determine whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Aurora H*., 222 Conn. App. 307, 317, 304 A.3d 875, cert. denied, 348 Conn. 931, 306 A.3d 1 (2023).

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun. . . . Section 17a-112 (j) provides in relevant part that [t]he Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [d]epartment . . . has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been

provided specific steps to take to facilitate the return of the child to the parent pursuant to [General Statutes §] 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue. . . . [The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation. . . .

"During the adjudicatory phase of a termination proceeding, a court generally is limited to considering only evidence that occurred before the date of the filing of the petition or the latest amendment to the petition, often referred to as the adjudicatory date. . . . Nevertheless, it may rely on events occurring after the [adjudicatory] date . . . [in] considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 487–89, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024); see also *In re Phoenix A.*, 202 Conn. App. 827, 841–42, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248 A.3d 1 (2021).

Furthermore, "[i]t is well established that a respondent's failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation. See *In re Kamora W.*, 132 Conn. App. 179, 190, 31 A.3d 398 (2011) (respondent refused to acknowledge drug or alcohol problem); *In re Jocquyce C.*, 124 Conn. App. 619, 626–27, 5 A.3d 575 (2010) (respondent failed to acknowledge habitual involvement with domestic violence); *In re Christopher B.*, 117 Conn. App. 773, 784, 980 A.2d 961 (2009) (respondent blamed others for problems); *In re Jermaine S.*, 86 Conn. App. 819, 834, 863 A.2d 720 (respondent's inability to admit she had substance abuse problem thwarted her ability to achieve rehabilitation), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005); *In re Sheila J.*, 62 Conn. App. 470, 481, 771 A.2d 244 (2001) (respondent failed to recognize her need for recommended counseling). . . . *In re Shane M.*, 318 Conn. 569, 589–90, 122 A.3d 1247 (2015). [A]s a general proposition, the failure to acknowledge and make progress in addressing the issues that led to a child's removal may be one of many

contributing factors to a court's determination that a parent has failed to achieve a sufficient degree of personal rehabilitation." (Internal quotation marks omitted.) *In re Niya B.*, supra, 223 Conn. App. 491–92. With these principles in mind, we turn to the claims on appeal.

I

The respondent first claims that the court's reliance on social studies submitted into evidence by the commissioner during the adjudicatory phase was impermissible under § 45a-717 (e) (1) and Practice Book § 35a-9, which he argues permit the court's consideration of and reliance on information in social studies solely during the dispositional phase. He further argues that, because *In re Tabitha P.*, supra, 39 Conn. App. 353, was decided prior to the enactment of General Statutes § 1-2z,[10] which he asserts "establishes policies of statutory construction that were not utilized by this court in considering the relevant statutory elements at work," this court should conduct a new analysis of "the judicial gloss applied in" *In re Tabitha P.* We disagree that the court's reliance on the social studies in the adjudicatory phase violated § 45a-717 (e) (1) and Practice Book § 35a-9, but we take this opportunity to resolve the persistent issue of the scope of *In re Tabitha P.* and the permissible use of a social study in the adjudicatory phase.

"Whether the trial court applied the proper legal standard is subject to plenary review on appeal. . . . The interpretation of a trial court's judgment presents a

[10] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

question of law over which our review is plenary." (Citation omitted; internal quotation marks omitted.) *In re Fayth C.*, 220 Conn. App. 315, 320, 297 A.3d 601, cert. denied, 347 Conn. 907, 298 A.3d 275 (2023).

Section 45a-717 (e) (1) and Practice Book § 35a-9 address the use of a social study in a termination of parental rights hearing. Section 45a-717 (e) (1) provides in relevant part that, in a hearing for the termination of parental rights, "[t]he court may, and in any contested case shall, request the [commissioner] . . . to make an investigation and written report to it, within ninety days from the receipt of such request. The report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to the court's determination of whether the proposed termination of parental rights will be in the best interests of the child, including the physical, mental, social and financial condition of the biological parents, and any other factors which the commissioner . . . finds relevant to the court's determination of whether the proposed termination will be in the best interests of the child." Practice Book § 35a-9 provides that "[t]he judicial authority may admit into evidence any testimony relevant and material to the issue of the disposition, including events occurring through the close of the evidentiary hearing, but no disposition may be made by the judicial authority until any mandated social study has been submitted to the judicial authority. Said study shall be marked as an exhibit subject to the right of any party to be heard on a motion in limine requesting redactions and to require that the author, if available, appear for cross-examination." Because both the statute and the rule of practice reference the issue of disposition and material in a social study that may be relevant to a court's determination of whether a termination of

parental rights is in a child's best interest, the respondent argues that they do not authorize the court's reliance on information in a social study during the adjudicatory phase of a termination of parental rights trial.

This court first considered the appropriateness of a court's reliance on a social study in the adjudicatory phase of a termination of parental rights proceeding in *In re Tabitha P.*, supra, 39 Conn. App. 353. On appeal in that case, the respondent mother claimed that "the trial court improperly relied on dispositional material in adjudicating the termination petitions"; id., 367; which material included "social studies prepared by [the department] after the filing of the termination petition[s] for use in the dispositional phase." Id., 368. This court disagreed that the use of the social studies in the adjudicatory phase was improper, concluding that, although the court was prohibited "from considering *events* subsequent to the filing of the termination petition[s] during the adjudicatory phase, the court is not prohibited from considering *material* prepared after the filing of the petitions, provid[ed] the facts and events discussed in that material predate the filing of the petition.[11] Social studies conducted by [the department] are submitted to be used by the court in the dispositional phase . . . but that does not preclude the studies from being filed or considered by the court or used by counsel during the adjudicatory phase of the hearing. In fact, copies of the dispositional reports and any evaluations are made available to counsel for the respondent, and the author of any such report, if available, can be required to testify and be subject to cross-examination as to the reasoning supporting the conclusions contained therein. . . . Furthermore, the procedural statutes guiding termination hearings explicitly direct the

[11] In the present case, no claim has been raised that any of the facts and events discussed in the social studies admitted into evidence do not predate the filing of the termination petition for each child.

court to order evaluations and to consider the results of the evaluations in ruling on the merits of the petition. See General Statutes § 45a-717 (d)." (Citations omitted; emphasis in original; footnote added; footnotes omitted.) *In re Tabitha P.*, supra, 368–69. Following our decision in *In re Tabitha P.*, this court consistently has held that a court properly may rely on a social study in the adjudicatory phase of a termination of parental rights proceeding.[12]

In the present case, the respondent, in effect, asks this court to reconsider our holding in *In re Tabitha P.* We first note that, in the absence of en banc consideration, we are unable to overrule our own precedent. See *State* v. *Gonzalez*, 214 Conn. App. 511, 524, 281 A.3d 501 ("[O]ne panel of this court cannot overrule the precedent established by a previous panel's holding. . . . As we often have stated, this court's policy dictates

[12] See *In re Prince S.*, 219 Conn. App. 629, 647, 296 A.3d 296 (court properly may rely on social study in both adjudicatory and dispositional phases of termination of parental rights proceeding), cert. denied, 347 Conn. 907, 297 A.3d 1011 (2023); *In re Lillyanne D.*, 215 Conn. App. 61, 80 n.15, 281 A.3d 521 ("[a]lthough the petitioner must submit a social study to the court for purposes of the dispositional hearing in contested cases . . . the court may rely on the social study in both the adjudicatory and dispositional phases of a termination of parental rights proceeding" (citations omitted)), cert. denied, 345 Conn. 913, 283 A.3d 981 (2022); *In re Gabriel C.*, 196 Conn. App. 333, 355 n.20, 229 A.3d 1073 ("any mandated department social study reports submitted for the court's use in the dispositional phase . . . may be filed or considered by the court or used by counsel during the adjudicatory phase of the hearing" (internal quotation marks omitted)), cert. denied, 335 Conn. 938, 248 A.3d 708 (2020); *In re Anna Lee M.*, 104 Conn. App. 121, 128, 931 A.2d 949 ("[s]ocial studies submitted by the department may be used by the court in both the adjudicatory and dispositional phases of a termination of parental rights hearing"), cert. denied, 284 Conn. 939, 937 A.2d 696 (2007); *In re Galen F.*, 54 Conn. App. 590, 600, 737 A.2d 499 (1999) ("the trial court is not precluded from considering material in social studies . . . in the adjudicatory phase of the hearing, even when the social study is prepared after the filing of the petitions, provided that the events considered did not occur after the petition date"); *In re Angellica W.*, 49 Conn. App. 541, 549, 714 A.2d 1265 (1998) (social studies submitted for use in dispositional phase may be considered by court during adjudicatory phase).

that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc. . . . Prudence, then dictates that this panel decline to revisit such requests." (Internal quotation marks omitted.)), cert. denied, 345 Conn. 967, 285 A.3d 736 (2022). The respondent did not seek en banc review of his appeal;[13] accordingly, we are unable to overturn our own precedent in *In re Tabitha P.*, which authorizes the court's use of a social study in the adjudicatory phase of a termination of parental rights proceeding, as well as in the dispositional phase.[14] Thus, because we are bound by our decision in *In re Tabitha P.* and its progeny,[15] we conclude that the court's use of and reliance on the social studies in the adjudicatory phase was not improper.[16]

[13] The respondent acknowledges in his appellate brief that he did not seek en banc review of this appeal and that this court is bound by its own precedent. Nevertheless, he asserts that "this court has significant power in determining issues that will be reviewed by our Supreme Court, either through concurring opinions or dissents. Therefore, the respondent presents the full argument for examination by this court." In his reply brief he further explains that he "did not seek consideration en banc because he is not asking [this court] to reverse its own precedent . . . ." Instead, he recognizes that any such change in the law on this issue "must be decided by our Supreme Court."

[14] Because we conclude that we are bound by our precedent in *In re Tabitha P.*, it is therefore unnecessary for us to conduct a new analysis of the plain language of § 45a-717 and Practice Book § 35a-9 pursuant to § 1-2z. Nevertheless, we note that our Supreme Court has held that the passage of § 1-2z does not require that we "abandon prior interpretations of statutory language [in cases that predate the enactment of the statute]. Rather, even after the passage of § 1-2z, it is customary for us to begin with this court's prior interpretations of statutes in previous cases." *Peek* v. *Manchester Memorial Hospital*, 342 Conn. 103, 124, 269 A.3d 24 (2022). Accordingly, although *In re Tabitha P.* was decided prior to the enactment of § 1-2z, it does not follow that an application of § 1-2z would dictate a different analysis of § 45a-717 and Practice Book § 35a-9.

[15] See footnote 12 of this opinion.

[16] We also note that, although the issue before this court in *In re Tabitha P.* did not concern whether the statute authorizes a court to consider a social study in the adjudicatory phase of a termination of parental rights proceeding, we specifically concluded that the court's consideration of such material in the adjudicatory phase "did not violate any statute or rule of

Nonetheless, we believe that this case presents an opportunity to clarify the scope of our decision in *In re Tabitha P.* As we have stated, the respondent mother in *In re Tabitha P.* claimed on appeal "that the trial court improperly relied on dispositional material in adjudicating the termination petitions." *In re Tabitha P.*, supra, 39 Conn. App. 367. Specifically, the respondent mother's challenge concerned the trial court's extensive citations in its memorandum of decision to multiple reports of a court-appointed psychologist and social studies that were prepared after the filing of the termination petitions. Id., 368.

The issue before this court, therefore, was whether it was appropriate for the trial court to consider those materials when they "were prepared after the date the termination petitions were filed." Id. In answering that question in the affirmative, we explained that the prohibition on a trial court's consideration of events occurring after the filing of a petition to terminate parental rights did not prohibit the court "from considering *material* prepared after the filing of the petitions, provid[ed] the facts and events discussed in that material predate the filing of the petition." (Emphasis in original.) Id. Because "[t]he materials cited to by the court throughout the adjudicatory portion of its decision contained facts, findings and conclusions based on events prior to the filing of the termination petitions . . . [and] [t]he events on which the adjudication was premised all occurred prior to the date of the petitions," this court concluded that "the trial court's consideration of the challenged materials did not violate any statute or rule of practice." Id., 369.

---

practice." *In re Tabitha P.* supra, 39 Conn. App. 369. Moreover, even though the respondent argues that "[t]he plain language of the statute does not authorize such use," there is no language in the statute or the rule of practice precluding the court from doing so.

The record available in *In re Tabitha P.* does not indicate whether there was a hearsay objection to the admission of the reports and social studies during the trial. Moreover, the focus of our decision was whether the court could consider social studies that were prepared after the filing of the termination petitions in the adjudicatory phase. Id., 368. Our holding that the court could do so, however, was limited to the circumstances of that case, in which the facts, findings and conclusions contained in the social studies were based on *events that occurred prior* to the filing of the termination petitions, and the events on which the adjudication was premised all occurred *before* the termination petitions were filed. Our decision, thus, in no way created an exception to any evidentiary rule, including the rule against hearsay,[17] nor did it prohibit counsel from objecting to the admission of hearsay. Id., 368–69. Therefore, counsel for a respondent parent may object

[17] Furthermore, this court previously has held "that the rules of evidence—including the prohibition on the admission of hearsay statements not covered by an exception—apply to juvenile proceedings, which include child protection matters, to the same extent that they do in other civil proceedings. See General Statutes § 46b-121; see also Conn. Code Evid. §§ 1-1 (b) and commentary (b) (5), and 8-2 (a). [C]ertain procedural informalities are authorized in juvenile proceedings under our common law, including a liberal rather than a strict application of the formal rules of evidence, provided due process is observed. . . . *In re Juvenile Appeal (85-2)*, 3 Conn. App. 184, 190, 485 A.2d 1362 (1985). Any such looser application of the rules of evidence, however, including the rule against hearsay, is unwarranted [if] such evidence is likely to be determinative of the matter, in which case, the court should return to the more formal rules of evidence. . . . Id. Given the significant rights that a parent has in the companionship, care, custody, and management of his or her children . . . laxity in procedural safeguards cannot be swept away by mere reference to the so-called informalities of [j]uvenile [c]ourt procedure. . . . *Anonymous* v. *Norton*, 168 Conn. 421, 425, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Accordingly, unlike in proceedings in which no adherence to the rules of evidence is required, courts in juvenile proceedings, despite their inherently informal nature, must remain cautious in admitting hearsay statements that go to the very heart of the issue to be decided." (Footnote omitted; internal quotation marks omitted.) *In re Alizabeth L.-T.*, 213 Conn. App. 541, 572–73, 278 A.3d 547 (2022).

to the admission of material contained within a social study on evidentiary or other grounds, and our decision in *In re Tabitha P.* should not be construed to tacitly allow admission of material that is otherwise inadmissible.[18]

## II

The respondent next claims that, notwithstanding our decision in *In re Tabitha P.*, the court's consideration of the social studies during the adjudicatory phase of the trial violated his due process rights under the three part test set forth by the United States Supreme Court in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).[19] The respondent concedes that this claim was not preserved for appeal and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233,

---

[18] We note that the commissioner agrees with this conclusion, acknowledging in her appellate brief that "social studies are subject to the normal rules of evidence, which ensures that trial courts do not erroneously terminate parental rights on irrelevant, unreliable, or prejudicial information contained in the social studies."

[19] "The three factors to be considered [under *Mathews*] are (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens attendant to increased or substitute procedural requirements. . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." (Internal quotation marks omitted.) *In re Zoey H.*, 183 Conn. App. 327, 336, 192 A.3d 522, cert. denied, 330 Conn. 906, 192 A.3d 425 (2018).

In the present case, the respondent argues that the private interest at stake is the right to family integrity and that the risk of erroneous deprivation is high because "under the current interpretation, the department is allowed to compile all of its evidence and present it in a prosecutorial document which is statutorily mandated to be admitted into evidence." The respondent further argues that the potential burdens to the state are limited to "requiring the department to offer its proof at trial rather than relying upon hearsay and unattributed statements from the social study as a substitute," and that, on the whole, "the *Mathews* factors weigh heavily in favor of limiting the social study, which is a prosecutorial document . . . to the dispositional portion of the hearing."

239–40, 576 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We decline to review this unpreserved claim.

"Pursuant to *Golding*, a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [S]ee *In re Yasiel R.*, [supra, 317 Conn. 781] (modifying third prong of *Golding*). The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Emphasis in original; internal quotation marks omitted.) *In re Maliyah M.*, 216 Conn. App. 702, 707, 285 A.3d 1185 (2022), cert. denied sub nom. *In re Edgar S.*, 345 Conn. 972, 286 A.3d 907 (2023).

The respondent argues that (1) the record is adequate for review "because there is no dispute that the social [studies] and [the] various amendments were admitted into evidence and relied upon by the trial court in the adjudicatory [phase]"; (2) the claim is of constitutional magnitude because "the use of [a] social study for adjudicatory purposes creates a fundamentally unfair proceeding that violates due process"; (3) the constitutional violation exists because, without reliance on the social studies and supporting documents, "[t]he evidence introduced at trial was not sufficient to warrant termination of the [respondent's] parental rights"; and (4) "the [commissioner] cannot prove that the constitutional error was harmless beyond a reasonable doubt."

We agree with the respondent that the record is adequate for review; however, we conclude that the claim is not of a constitutional magnitude.

Although the respondent characterizes his claim as a violation of his due process rights, the claim, in essence, challenges the admission of the social studies and, thus, is evidentiary in nature. See *In re Lillyanne D.*, 215 Conn. App. 61, 70–73, 281 A.3d 521 (respondent mother challenged trial court's evidentiary ruling admitting into evidence social study and addendum), cert. denied, 345 Conn. 913, 283 A.3d 981 (2022); *In re Galen F.*, 54 Conn. App. 590, 600–601, 737 A.2d 499 (1999) (challenge to admission of social study on hearsay grounds was evidentiary in nature). It is well established that a "defendant cannot raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right. . . . Thus, [o]nce identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily [rejected]. . . . We previously have stated that the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Internal quotation marks omitted.) *State* v. *Waters*, 214 Conn. App. 294, 314, 280 A.3d 601, cert. denied, 345 Conn. 914, 284 A.3d 25 (2022); see also *Kovachich* v. *Dept. of Mental Health & Addiction Services*, 344 Conn. 777, 815 n.22, 281 A.3d 1144 (2022) ("[r]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature" (internal quotation marks omitted)). This principle applies equally in a termination of parental rights proceeding. "The fact that this is a termination of parental rights case does not transform an evidentiary matter into a constitutional matter."

*In re Miyuki M.*, 202 Conn. App. 851, 860, 246 A.3d 1113 (2021); see *In re Antonio M.*, 56 Conn. App. 534, 544, 744 A.2d 915 (2000) (Even though "[t]he right of a parent to raise his or her children has been recognized as a basic constitutional right . . . [u]npreserved hearsay claims do not automatically invoke constitutional rights . . . . The appellate courts of this state have consistently held that admission of statements that are either irrelevant or impermissible hearsay is not a constitutional error." (Citations omitted; internal quotation marks omitted.)).[20] Accordingly, we conclude that the respondent's claim is not of a constitutional magnitude, and, therefore, the claim is not reviewable.

### III

The respondent's final claim is that the trial court improperly admitted hearsay evidence contained in the commissioner's exhibits and that the improperly admitted hearsay was harmful. The commissioner concedes that most of the challenged hearsay statements were improperly admitted[21] but claims that their admission was harmless because "the outcome of the trial would have been no different had the statements been

---

[20] We note that our Supreme Court "has recognized that an unpreserved evidentiary claim may be constitutional in nature *if* there is a resultant denial of fundamental fairness or the denial of a specific constitutional right . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Turner*, 334 Conn. 660, 674, 224 A.3d 129 (2020). In light of our determination that any error was harmless; see part III of this opinion; we need not reach the issue of whether there was a denial of fundamental fairness or of a specific constitutional right.

[21] The only exception to the commissioner's concession concerns the hearsay statements of the children's foster mother, which the commissioner argues were admissible under the business records exception to the hearsay rule because she was an agent of the department. See *In re Barbara J.*, 215 Conn. 31, 42, 574 A.2d 203 (1990). Because we conclude that any error in the admission of the alleged hearsay statements in the commissioner's exhibits, including those of the foster mother, was harmless, we need not decide whether the hearsay statements of the foster mother were properly admitted under the business records exception to the rule against hearsay.

excluded." Specifically, the commissioner asserts, inter alia, that "there is evidence to [the] same effect in the record" and that "[t]he unchallenged portions of the [social] studies provide additional, cumulative evidence regarding [the respondent's] history with the department, his continued criminal behaviors, his inconsistent engagement in mental health and substance use services, his continued relationship with Alexandria C., his lack of insight into her mental health, and his inability to protect [A] and [K] from Alexandria C.'s erratic behaviors." We agree with the commissioner. Without deciding whether the alleged hearsay was improperly admitted,[22] we conclude that the respondent has not demonstrated that its admission was harmful.

We first set forth our standard of review and the legal principles that govern our resolution of this claim. "Our standard of review regarding challenges to a trial court's

[22] We note that portions of the alleged hearsay in this case were contained in the evaluation performed by Dr. Rogers, who the parties stipulated is an expert in clinical and forensic psychology. We further note that " '[t]he fact that an expert opinion is drawn from sources not in themselves admissible does not render the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. *Vigliotti* v. *Campano*, 104 Conn. 464, 133 A. 579 (1926); *Schaefer, Jr. & Co.* v. *Ely*, 84 Conn. 501, 508, 80 A. 775 (1911). An expert may base his opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. *State* v. *Cuvelier*, 175 Conn. 100, 107–108, 394 A.2d 185 (1978); see Fed. R. Evid. 703. This is so because of the sanction given by the [witness'] experience and expertise. *Burn* [*& Crump*] v. *Metropolitan Lumber Co.*, 94 Conn. [1] 5, 6, 107 A. 609 (1919).' [C. Tait, Tate and LaPlante's Handbook of Connecticut Evidence (2d Ed. 1988) § 7.16.8 (c), p. 182]. '[W]hen the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.' " *In re Barbara J.*, 215 Conn. 31, 42–43, 574 A.2d 203 (1990); see also *Kohl's Dept. Stores, Inc.* v. *Rocky Hill*, 219 Conn. App. 464, 487–88, 295 A.3d 470 (2023); Conn. Code Evid. § 7-4 (b); E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 7.7.4, pp. 465–66. As we have indicated in this opinion, however, we do not reach the issue of whether the alleged hearsay was properly admitted.

evidentiary rulings is that these rulings will be overturned on appeal only where there was . . . a showing . . . of substantial prejudice or injustice. . . . Additionally, it is well settled that even if the evidence was improperly admitted, the [party challenging the ruling] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *In re Prince S.*, 219 Conn. App. 629, 644, 296 A.3d 296, cert. denied, 347 Conn. 907, 297 A.3d 1011 (2023). "It is [also] well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted [evidence]. . . . *In re Anna B.*, 50 Conn. App. 298, 305–306, 717 A.2d 289 (1998); see also *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 23, 60 A.3d 222 (2013) ([i]n determining whether evidence is merely cumulative, we consider the nature of the evidence and whether any other evidence was admitted that was probative of the same issue as the evidence in controversy)." (Internal quotation marks omitted.) *In re Lillyanne D.*, supra, 215 Conn. App. 74; see also *Kovachich* v. *Dept. of Mental Health & Addiction Services*, supra, 344 Conn. 819.

We next set forth the following additional facts, which are relevant to this claim. As we stated previously in this opinion, the petitioner joined in Alexandria C.'s motion in limine, which sought to exclude various alleged hearsay contained within the commissioner's exhibits. Specifically, the motion in limine first sought to exclude alleged hearsay statements or information within multiple social studies and status reports that derived from Dr. Levy's 2021 psychological evaluation, some of which concerned Alexandria C. and others the respondent.[23] For example, exhibit eight is a social study

---

[23] In his appellate brief, the respondent has not briefed or provided any analysis regarding how he was harmed by the alleged hearsay from Dr. Levy's evaluation related to Alexandria C. "We repeatedly have stated that

in support of the termination of the respondent's parental rights with respect to K dated June 14, 2022. In the portion of the social study addressing the respondent, the study references the psychological evaluation that was conducted by Dr. Levy in 2021, including her conclusions that the respondent's "emotional functioning confirms his history of antisocial behavior. It also suggests failures [to form] close relationships, [sensitivity] in interpersonal relationships, distrust, depression, inflated self-esteem, hostility and bitterness; stress in the environment and compulsiveness or rigidity." It further provides: "Dr. Levy . . . opined that [the respondent] did not understand how [Alexandria C.'s] own '[dysregulation] affects others, particularly' his child. Dr. Levy noted that while [the respondent] demonstrated some competencies in parenting such as knowledge of child development, 'the competency of clear parental priorities, i.e. putting the child's needs first, is the least met competency and perhaps one of the most important. The parental lack of consistency, stability and trust, manifested by emotional dysregulation, inadequate and transient housing, employment, financial struggles and frequent incarcerations do not place the child's needs first.' Ultimately, Dr. Levy opined that "[i]t is unclear if the father would be able to sustain employment and housing, in order to care for himself

[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Colandrea* v. *Connecticut State Dental Commission*, 221 Conn. App. 597, 620 n.25, 302 A.3d 348 (2023), cert. denied, 348 Conn. 933, 306 A.3d 475 (2024). Accordingly, any such claim is deemed abandoned, and we focus our analysis on the alleged hearsay from Dr. Levy concerning the respondent.

and his child." Similar statements from Dr. Levy's evaluation are contained in exhibit three (a social worker affidavit dated December 27, 2021), exhibit ten (a study in support of the motion to support the permanency plan dated September 16, 2022), and exhibit eleven (an addendum to a social study in support of the termination petitions dated September 8, 2022). The motion in limine also sought to exclude alleged hearsay statements from the foster mother[24] in which the foster

[24] The motion in limine also sought to exclude alleged hearsay statements from Susan Allen, a visitation supervisor; statements within various exhibits that summarize information contained within the evaluation of Dr. Rogers; and exhibits eighteen and nineteen, which included Rogers' initial report and psychological evaluation. The motion acknowledged, however, that any of those hearsay issues could be cured so long as Allen and Dr. Rogers testified at trial, which did occur. Therefore, their statements and the reports of Dr. Rogers in those exhibits are not at issue with respect to this claim.

Additionally, the motion in limine sought to exclude alleged hearsay statements (1) from Joel Tudisco, who, as we stated previously in this opinion, is an advanced practice registered nurse who has provided psychiatric care for Alexandria C. since June, 2020, and whose comments related to Alexandria C.'s medication management and her mental health issues and expressed concerns about Alexandria C.'s use of medical marijuana; (2) attributable to A; (3) from Akisha Cassermere, a visitation supervisor, in which she referenced statements made to her by A and regarding her observations of visits between A and the respondent and Alexandria C.; and (4) from Alicea Corey, a psychologist who treated A, detailing conversations she had with and statements made by A, expressing her opinion that it was not in A's best interest to continue visitations, and describing A's behavior.

The respondent has not provided any analysis or argument in his appellate brief regarding how he was harmed by any alleged hearsay from Tudisco, Cassermere or Corey. Therefore, we deem any such claim abandoned. "[B]eyond their bald assertion of harm, the respondents do not explain how the exclusion of this evidence was harmful to them. See *In re Nevaeh G.-M.*, 217 Conn. App. 854, 885–86, 290 A.3d 867 ('[i]t is well settled that even if [an evidentiary error is proven], the [party challenging the ruling] must also establish that the ruling was harmful and likely to affect the result of the trial' . . .), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023). Accordingly, we deem this claim to be abandoned." *In re Olivia W.*, 223 Conn. App. 173, 196, 308 A.3d 571 (2024). Moreover, with respect to statements attributed to A, and to the extent that the alleged hearsay from the foster mother, Cassermere and Corey concern statements made by A, the court granted the motion in limine in part with respect to any statements made by A, which, therefore, are not at issue in this appeal.

mother commented about concerns she had with how A reacted to visits with the respondent and Alexandria C., describing A's behavior before and after such visits and how she becomes "clingy," and relating statements made by A concerning the visits. [25] Thus, in this appeal, the two sources of alleged hearsay to be addressed are Dr. Levy and the foster mother.

We conclude that the respondent has failed to demonstrate the harmfulness of the challenged hearsay

---

[25] In his principal appellate brief, the respondent refers to alleged hearsay statements in exhibit eleven, an addendum to a social study in support of the petition for the termination of his parental rights with respect to K dated September 8, 2022, from Joseph Ortiz, a case manager who was assigned to the respondent in connection with fatherhood engagement services he sought at Madonna Place. Ortiz' alleged hearsay statements concern the respondent's attendance at Madonna Place, specifically, his failure to follow through with attending a final group session. The hearsay objections raised in the motion in limine before the trial court did not specifically mention any statements made by Ortiz, nor did the respondent raise any such specific claims regarding Ortiz or the particular statement in exhibit eleven before the trial court, although the respondent objected at trial to " 'any statements that come from someone who is not testifying' . . . ." The commissioner argues in her appellate brief that this court should decline to review the respondent's harmful error claim as it pertains to the statements of Ortiz. We conclude that we need not decide whether the respondent's objection was sufficiently specific to include the statements of Ortiz because, even if we review this aspect of the respondent's claim, it nonetheless fails, as the challenged hearsay from Ortiz is cumulative of other evidence and testimony in the record concerning the respondent's failure to complete services to which he had been referred, including the testimony of Haley Flax, a social worker, who specifically referenced the respondent's failure to complete parenting classes at Madonna Place.

The respondent also refers to an "unattributed opinion" in exhibit eleven stating that "[the respondent] has made limited progress and appears to lack judgment about healthy boundaries. Although [the respondent] has not presented with threatening behaviors, he continues to support [Alexandria C.'s] decision and it appears as though he has limited insight about the impact of her erratic and threatening behaviors." We note that it appears that the alleged "unattributed opinion" in exhibit eleven was made by the author of the addendum to the social study, Flax, who testified at trial consistent with the challenged statement. In fact, the social studies, status reports and addenda included in exhibits eight, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, and seventeen all indicate that they were submitted by Flax.

because it is cumulative of other properly admitted evidence and testimony. We first address the alleged hearsay from Dr. Levy. At the trial, Haley Flax, a social worker assigned to this matter, testified about the respondent's history with the department and the concerns that led to the children's removal, including the respondent's inconsistent participation in recommended services, his inability to provide for the children's safety and well-being, and the department's concerns as to his "parenting skills, mental health, and substance abuse." Flax testified concerning the respondent's housing, explaining that, for the past two years, he and Alexandria C. have had stable housing but that, prior thereto, it was not consistent; that they currently reside in an apartment; and that they were issued a notice to quit in February, 2023, and a formal eviction proceeding had been commenced, but they have not vacated. She also testified as to Alexandria C.'s "erratic and compulsive behavior." For instance, she testified about an incident in which Alexandria C. "had shown up at the [department] office and was acting out in a way to where the police almost needed to be called," and that there were also concerns regarding what [the department] perceived to be as passive threats made on social media [by Alexandria C.] regarding the department." Flax also testified that the respondent and Alexandria C. continued to present as a couple, that Flax has ongoing concerns regarding the respondent's limited insight and ability to manage his emotions, and that her biggest concerns regarding the respondent are his lack of engagement and failure to follow through with treatment recommendations, as well as his limited insight into Alexandria C.'s behaviors and how that affects the children. According to Flax, she is concerned that the respondent "would not be able to step in to protect the children and be that protective capacity when [Alexandria C.] is acting erratically."

Dr. Rogers echoed these concerns in his testimony. Specifically, he testified that Alexandria C. "is highly impulsive [and] doesn't cope well even with minor stresses, and she is likely to act in highly impulsive ways that would endanger the safety of someone who is dependent on her," and that the respondent "shows very little insight into [Alexandria C.'s] behavior and its impact on [the] children and would not, in fact, shield [the] children from that adverse impact." Dr. Rogers also testified that the respondent presented with "a number of problematic personality traits that he exhibited over a number of years, beginning in adolescence with some conduct problems. Those extended into adulthood with some criminal activity, and generally a negative and angry attitude about life and a feeling of being cheated and misused. At times, this feeling serves as rationale for acting likewise to other individuals and if you will, taking the law into his own hands. Again, I think that's been evidenced in his criminal activity. Certainly, his anger is often present . . . usually expressed in indirect ways; resistance, negativity, that kind of thing. And I indicated on that basis that I thought that he suffered from a personality disorder." Dr. Rogers testified further that the respondent does not have the ability to meet the emotional, developmental, and physical needs of the children, who need permanency and stability, about the respondent's failure to "substantially change, in the period since removal," and regarding his concern that the children would suffer from "a lack of permanency and from continued contact with the parents."

In addition to the testimony presented at the trial, exhibit nineteen, which contains the psychological evaluation performed by Dr. Rogers, was admitted as a full exhibit without objection. The psychological evaluation performed was based on an "[e]valuation of each adult [that] consisted of review of records, discussion of

[those] records, review of a demographics question-naire, clinical interview, mental status examination, psychological testing, parent/child observations and collateral contacts as directed and approved by the court." Dr. Levy's psychological evaluation was one of many records Dr. Rogers reviewed in conducting his evaluation. Dr. Rogers' evaluation addresses the respondent's work history, education, residence history, criminal history, rearing, relationship history, physical health, mental health, and substance use. An examination of Dr. Rogers' comprehensive and detailed evaluation demonstrates that it sets forth information that is cumulative of the alleged hearsay statements from Dr. Levy.

The evaluation notes that the respondent has had an unsettled work history, often "bouncing from job to job," with his longest job lasting three and one-half years. His housing history has been equally unsteady. With respect thereto, the evaluation provides: "Living arrangements have been disrupted by incarcerations and related halfway house placements upon release. In and around [A's] removal, he was living with his aunt. [Alexandria C.] was also there. On occasion, he noted he had been homeless for a time. He reported stable housing since May, 2021, and he and [the respondent] have cohabited since that time."

In his evaluation, Dr. Rogers referenced Dr. M. Deborah Gruen, a psychologist who had performed a psychological evaluation of the respondent in November, 2016, and Dr. Gruen's "contention that the [respondent] did not understand how [Alexandria C.'s] dysregulation affects the children." Notably, the respondent has not raised any issue with Dr. Gruen's statement, even though it is identical to the one made by Dr. Levy in her evaluation to which the respondent has objected. Dr. Rogers' evaluation further addresses the respondent's low self-esteem and how he is "sour on life," and

provides that his pervasive emotion is anger, he has "few skills for coping with the trials of everyday life," and that "his behavior is difficult to predict." According to Dr. Rogers, the respondent "perceives little responsibility for the children's removal or for their continued placement outside the home. Though he can function adequately in some employment situations, he evinces little skill in coping with pressures outside his narrow routine, and added stresses readily precipitate impulse decisions and erratic actions. His flight from a halfway house, resulting in further criminal sanctions, seems a good case in point. Though his actions have brought him little success, he remains stubborn in his outlook and resistant to examining or changing his approach." Moreover, the evaluation provides that, "[w]hile the [respondent] does not suffer from any major psychiatric illness, he has demonstrated at best inconsistent participation in services. He is largely resistant to efforts at education and remediation, and has made few adjustments in his circumstance to encourage the belief that, within a reasonable period, he could assume the role of caretaker for either child. In addition, he fails to recognize [Alexandria C.'s] serious limitations and the impact of her labile emotions and behavior on a dependent child, and he is likely to permit such behavior to continue in their presence should reunification take place." In his evaluation, Dr. Rogers points out that the respondent "is strongly enmeshed in a relation[ship] with [Alexandria C.] . . . and would not be expected to shelter [K] from her volatility and its attendant risks. Any representations he makes about willingness to divorce himself from [Alexandria C.] to care for this child should be regarded skeptically . . . ." As reported by Dr. Rogers, the respondent "evinces a long-standing pattern of maladaptive behavior characterized by criminal activity, impulsive action and decision-making, negativity and resistance to influence," and "he has

few qualms about violating rules and proscriptions to gain the rewards of which he feels he has been cheated."[26]

In sum, the foregoing evidence and testimony are probative of the same information as the challenged hearsay from Dr. Levy's evaluation regarding the respondent's history of antisocial behavior; his distrust, hostility, and bitterness; his inability to understand how Alexandria C.'s erratic and emotional behavior affects others, especially the children; his failure to acknowledge the issues that led to the children's removal and to make progress in addressing those issues; his failure to comply with the specific steps ordered to facilitate his reunification with the children; his lack of ability to care for the needs of the children; his parental lack of consistency; his unstable employment and his inadequate and transient housing; and his criminal history. For that reason, any alleged hearsay from Dr. Levy is cumulative of other properly admitted evidence and,

---

[26] The record also contains other exhibits that were admitted in full without objection, including exhibit one, a January 10, 2019 memorandum of decision by the court, *Randolph*, *J.*, terminating the respondent's parental rights as to E and adjudicating A neglected; exhibit eighteen, the initial report of Dr. Rogers; exhibit twenty-one, the respondent's criminal records; and exhibits twenty-two, twenty-five, and twenty-six, the specific steps ordered for the respondent. For instance, Judge Randolph's decision discusses the respondent's criminal history, his failure to attend treatment sessions and other appointments for an outpatient substance abuse program, and his need to participate in extensive parental skills training. The criminal records show that, despite having been issued specific steps in 2018, 2019, and 2021, which directed the respondent not to become involved with the criminal justice system, the respondent had been arrested on multiple occasions since December, 2019, for interfering with an officer, resisting arrest, larceny in the fourth degree, larceny in the sixth degree, and other misdemeanor offenses such as illegally operating a motor vehicle.

Moreover, with respect to the social studies, status reports and addenda contained in exhibits eight, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, and seventeen, the hearsay objections pertained only to portions of those exhibits. The portions to which the hearsay objections do not apply contain ample information similar to the alleged hearsay.

thus, was not likely to have affected the result of the trial.

Like with the challenged hearsay from Dr. Levy's evaluation, the alleged hearsay statements of the foster mother also are cumulative of other evidence in the record. Those statements primarily relate to the foster mother's concerns about A's conduct before and after visits with the respondent and Alexandria C., in that she described A as being hesitant to attend weekly visits, upset about having to go and refusing to attend some of the visits, and being "clingy" after such visits. That information, however, can be found throughout the record before the court. For example, Allen, a visitation supervisor, provided similar testimony at the termination of parental rights trial. Specifically, she described A as being very vocal, engageable and talkative while in her foster home, as opposed to during visits with the respondent and Alexandria C. She also recounted a visit in which A was hesitant to attend, how she was upset afterward and that there was another visit that A refused to attend. Additionally, Flax testified that A would cry before visits or refuse to attend and that, when she arrived back at her foster home, she would be "clingy" or emotional. Finally, Dr. Rogers' evaluation includes statements from collateral contacts such as the foster mother that are similar to the ones objected to on hearsay grounds contained in other exhibits, and it sets forth in great detail A's reluctance to attend visits, as well as her conduct before and after visits with the respondent.

Accordingly, we conclude that the respondent has not demonstrated that he was harmed by any of the alleged hearsay from Dr. Levy's evaluation or the foster mother's statements in light of the abundance of similar evidence and testimony in the record. In order to demonstrate that he was harmed by the court's alleged improper admission of hearsay, it was incumbent on

the respondent to "establish that, but for the evidentiary error, the outcome of the trial likely would have been different." *In re Lillyanne D.*, supra, 215 Conn. App. 73. The respondent cannot do so, however, in light of the fact that the information contained in the alleged hearsay is available elsewhere in the record. "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Internal quotation marks omitted.) *In re Daniel D.*, 219 Conn. App. 211, 220, 294 A.3d 1027, cert. denied, 347 Conn. 906, 297 A.3d 1011 (2023). Because the challenged hearsay was cumulative of other properly admitted evidence, the respondent has failed to demonstrate substantial prejudice or injustice, or that the result would have been different without the alleged hearsay. See *In re Prince S.*, supra, 219 Conn. App. 644–45; *In re Latifa K.*, 67 Conn. App. 742, 752, 789 A.2d 1024 (2002). The respondent, therefore, has not met his burden of demonstrating harm. See *DiNardo Seaside Tower, Ltd.* v. *Sikorsky Aircraft Corp.*, 153 Conn. App. 10, 47–48, 100 A.3d 413, cert. denied, 314 Conn. 947, 103 A.3d 976 (2014).

The judgments are affirmed.

In this opinion the other judges concurred.